**ALLIANCE FOR COLORADO'S FAMILIES, a Colorado unincorporated nonprofit association, Petitioner–Appellant and Cross–Appellee,**

v.

**Leland GILBERT, Respondent–Appellee and Cross–Appellant,**

**and**

**Division of Administrative Hearings, Appellee,**

**and**

**Colorado Secretary of State, Intervenor–Appellee.**

**No. 05CA2137.**

Colorado Court of Appeals, Div. II.

Nov. 1, 2007.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2007.

Issacson, Rosenbaum, P.C., Edward T. Ramey, Blain D. Myhre, Denver, Colorado, for Petitioner–Appellant and Cross–Appellee.

Hackstaff Gessler, LLC, Scott E. Gessler, Denver, Colorado, for Respondent–Appellee and Cross–Appellant.

John W. Suthers, Attorney General, Denver, Colorado, for Appellee.

Maurice G. Knaizer, Assistant Attorney General, Denver, Colorado, for Intervenor–Appellee.

Opinion by Judge ROTHENBERG.

In this case involving Colorado's campaign finance law, petitioner, the Alliance for Colorado's Families (ACF), appeals from an order assessing a $36,000 penalty against it by an administrative law judge (ALJ) assigned by the Division of Administrative Hearings (the Agency). The penalty was assessed because the ALJ determined that ACF became a "political committee" as a matter of law and violated the Campaign and Political Finance Amendment, Colo. Const. art. XXVIII (the Amendment), and section 1–45–108, C.R.S. 2007, when it conducted certain campaign activity during the 2004 election. Respondent, Leland Gilbert, cross-appeals the ALJ's method of calculating the penalty imposed on ACF. We vacate the order and remand for further proceedings.

## I. Background

The facts before us are largely undisputed. ACF is an unincorporated nonprofit association and engages in political advocacy pertinent to candidate elections and related issues of public concern. Because ACF engages in "electioneering communications," as defined by section 2(7)(a) of the Amendment, it is required to file periodic reports with the Secretary of State of itemized contributions and spending on electioneering communications. According to those filings, ACF received and spent nearly $900,000 on such communications during the 2004 election cycle.

On October 29, 2004, a few days before the 2004 election, ACF spent approximately $18,000, which was about 2% of its total spending for that year, for the production of a single radio advertisement. The advertisement, which was aired several times, compared Colorado House of Representatives candidate Kent Lambert to the 1950s television character "Eddie Haskell." The text of the advertisement was as follows:

You know the smarmy little guy on Leave It to Beaver?

Now we've got our own Eddie Haskell right here in Colorado Springs, House candidate Kent Lambert.

And his latest little scheme is the kind of dirty trick only an Eddie Haskell could think of.

Kent Lambert and his dirty tricksters decided that twenty-four-hour surveillance of his opponent was a nifty idea. Just hire a private investigator and stake out the opponent's home—twenty-four, seven.

So why did he do it? Because he knows that twenty-two-year resident Mike Merrifield has been fighting for our community for a long time. Representative Merrifield has been fighting for affordable health care for all and good schools for our kids.

We saw right through Eddie Haskell when he said, "Gee, you look lovely tonight, Mrs. Cleaver." And we see through Kent Lambert's adolescent game of hide the ball.

This election is too important for childish tricks. We need mature leadership.

Don't let Eddie Haskell, er Kent Lambert, represent you in the State House.

Paid for by Alliance for Colorado's Families.

Following the airings of this radio advertisement, Gilbert filed a complaint with the Colorado Secretary of State pursuant to section 9(2)(a) of the Amendment, alleging that (1) the Eddie Haskell ad advocated Lambert's defeat in the 2004 election; (2) it therefore constituted "express advocacy"; (3) by engaging in such advocacy, ACF was converted by operation of law from an organization not subject to contribution limits to a "political committee" under section 2(12) of the Amendment; and (4) ACF was retroac-

tively subject to contribution limits because it had received contributions exceeding the limits permitted for political committees and had failed to register and file reports required of such committees by section 1–45–108. The Secretary of State referred the complaint to the Agency to determine ACF's liability, if any, pursuant to section 9(2)(a).

The parties agreed the issue of liability could be resolved without a hearing based on stipulated facts. After considering the parties' submissions, the ALJ issued a written order finding, as relevant here, that ACF "became a 'political committee' ... on October 29, 2004 [when it] made the expenditure for production of the [radio] advertisement." The ALJ concluded ACF had violated the Amendment and granted summary judgment in favor of Gilbert on the liability issue.

The ALJ later conducted a hearing to determine the appropriate sanction under section 10(1) of the Amendment, which provides that the civil penalty sanctions should be "at least double and up to five times the amount contributed, received, or spent in violation of the applicable provision of [the Amendment]."

At the penalty hearing, ACF challenged the constitutionality of the Amendment facially and as applied. However, on appeal, ACF has based its constitutional challenge on the ALJ's imposition of a penalty on ACF for electioneering activities that could only be found to have violated constitutional spending limits based on a retroactive determination that, because of the size of the contributions ACF had received, it was converted into a political committee and was therefore subject to the penalties in section 10(1).

Gilbert's position at the penalty hearing was that once ACF became a political committee, it was subject to the $500 contribution limit in section 3(5) of the Amendment *for the entire election cycle* of the House of Representatives, and that this contribution limit should apply retroactively to all contributions received by ACF. Gilbert urged the ALJ to impose a penalty against ACF of $4,105, 508, which was five times the amount of all contributions over $500 that ACF had received during the election cycle.

The ALJ agreed with Gilbert that section 10(1) authorized such a penalty, but he concluded that amount was excessive. He assessed a penalty of $36,000, which was double the amount actually spent by ACF on the advertisement. In reaching his conclusion that penalties could be assessed retroactively, the ALJ reasoned that "once an organization becomes a political committee, it is subject to the $500 contribution limit in Section 3(5) for the entire House of Representatives election cycle," and that the "limit applies retroactively to contributions already received."

Because ACF is challenging the constitutionality of a state constitutional provision, the Secretary of State filed a motion in this court to intervene, which was granted.

## II. Contentions

ACF contends that the ALJ erred in concluding it was transformed by operation of law into a political committee, and that the ALJ's application to ACF of the penalty section of the Amendment violates its rights under the First and Fourteenth Amendments to the United States Constitution.

In Gilbert's cross-appeal, he initially contended the penalty imposed on ACF was inadequate as a matter of law because it was not at least double the amount of unlawful contributions received by ACF during the election cycle. However, in an unusual turn of events, on appeal, both ACF and Gilbert have asserted in their reply briefs that the proper remedy in this case is a partial invalidation of the penalty portion of the Amendment because of its retroactive application. The Secretary of State has urged us to uphold the penalty portion of the Amendment by construing it narrowly. We conclude the case must be remanded for further proceedings and findings by the ALJ as set forth below.

### A. Standard of Review

■■■ An agency decision will not be reversed unless it is arbitrary or capricious, unsupported by the evidence, or contrary to law. *Coffman v. Colo. Common Cause,* 102 P.3d 999 (Colo.2004); *Rutt v. Poudre Educ. Ass'n,* 151 P.3d 585 (Colo.App.2006) *(cert.*

*granted Feb. 5, 2007); Nededog v. Colo. Dep't of Health Care Policy & Fin.*, 98 P.3d 960, 961 (Colo.App.2004). We examine the record in the light most favorable to the agency decision. Whether the record contains substantial evidence to support the agency decision is a question of law we review de novo. *Martelon v. Colo. Dep't of Health Care Policy & Fin.*, 124 P.3d 914 (Colo.App.2005).

We also review de novo the legal and constitutional standards as applied in this case. *League of Women Voters v. Davidson*, 23 P.3d 1266, 1270 (Colo.App.2001).

In construing a constitutional provision, we are required to give effect to the intent of the electorate that adopted it. We look at the words used, reading them in context and according them their plain and ordinary meaning, and where ambiguities exist, we interpret the constitutional provision as a whole in an attempt to harmonize its parts. *Bruce v. City of Colorado Springs*, 129 P.3d 988 (Colo.2006); *Harwood v. Senate Majority Fund, LLC*, 141 P.3d 962 (Colo. App.2006). We also consider the object to be accomplished and the mischief to be prevented by the provision. *City of Aurora v. Acosta*, 892 P.2d 264 (Colo.1995). An interpretation that creates an unreasonable or absurd result should be avoided. *Bickel v. City of Boulder*, 885 P.2d 215 (Colo.1994).

The electorate, as well as the legislature, must be presumed to know the existing law at the time it amends or clarifies that law. *See Common Sense Alliance v. Davidson*, 995 P.2d 748, 754 (Colo.2000); *Bickel*, 885 P.2d at 228 n. 10 (the general rules of statutory construction apply when interpreting citizen-initiated measures); *see also Cooper v. People*, 973 P.2d 1234, 1239 (Colo.1999), *disapproved of on other grounds by Griego v. People*, 19 P.3d 1 (Colo.2001). State constitutional provisions that violate federal constitutional law may be held invalid either facially or as applied.

*See Colo. Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137 (10th Cir.2007).

### B. Purpose of the Amendment

The Amendment was adopted by the People of Colorado pursuant to an initiative voted upon at the 2002 general election, and it became effective December 20, 2002. *See Sanger v. Dennis*, 148 P.3d 404 (Colo.App. 2006) (construing Amendment).

The purpose of the Amendment is stated in section 1:

> The people of the state of Colorado hereby find and declare that large campaign contributions to political candidates create the potential for corruption and the appearance of corruption; that large campaign contributions made to influence election outcomes allow wealthy individuals, corporations, and special interest groups to exercise a disproportionate level of influence over the political process; that the rising costs of campaigning for political office prevent qualified citizens from running for political office; that because of the use of early voting in Colorado timely notice of independent expenditures is essential for informing the electorate; that in recent years the advent of significant spending on electioneering communications ... has frustrated the purpose of existing campaign finance requirements; that independent research has demonstrated that the vast majority of televised electioneering communications goes beyond issue discussion to express electoral advocacy; ... and that the interests of the public are best served by limiting campaign contributions, encouraging voluntary campaign spending limits, providing for full and timely disclosure of campaign contributions, independent expenditures, and funding of electioneering communications, and strong enforcement of campaign finance requirements.

The Amendment contains two separate dollar limits that are relevant here. First, under section 3(5), an association that qualifies as a political committee may not receive aggregate contributions in excess of $500 from any person during a two-year House of Representatives cycle. If a political committee violates that section of the Amendment, both the committee and the contributor are "subject to a civil penalty of at least double and up to five times the amount contributed,

received or spent" in violation of that section. Amendment § 10(1).

Second, section 2(12)(a) defines a "political committee" as "any person, other than a natural person, or any group of two or more persons, including natural persons that have accepted or made contributions or expenditures in excess of $200 to support or oppose the nomination or election of one or more candidates."

> As relevant here, "expenditure" is defined as any purchase, payment, distribution, loan, advance, deposit, or gift of money by any person for the purpose of expressly advocating the election or defeat of a candidate or supporting or opposing a ballot issue or ballot question.

Amendment § 2(8)(a).

"Contribution" is defined in pertinent part as

> (I) The payment, loan, pledge, gift, or advance of money, or guarantee of a loan, made to any candidate committee, issue committee, political committee, small donor committee, or political party;
>
> (II) Any payment made to a third party for the benefit of any candidate committee, issue committee, political committee, small donor committee, or political party;
>
> (III) The fair market value of any gift or loan of property made to any candidate committee, issue committee, political committee, small donor committee or political party.

Amendment § 2(5)(a).

### C. Analysis

It is undisputed that ACF qualifies as a "person," that it accepted more than $500 from at least one contributor, that it spent more than $200 on the Eddie Haskell radio advertisement, and that the subjects of the advertisement were political candidates. At issue is whether ACF's payment and sponsorship of that radio advertisement transformed it into a "political committee" within the meaning of section 2(12)(a), and therefore subjected ACF to a penalty; and whether

the imposition of the penalty against ACF violated its constitutional rights.

The law relating to campaign finance reform is in a state of flux as the courts attempt to balance the desire of Congress and the states to enact legislation that will reduce the potential for corruption and the appearance of corruption in political campaigns, against contributors' First and Fourteenth Amendments' guarantees of freedom of speech and association. *See Randall v. Sorrell,* —— U.S. ——, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) (concluding Vermont Campaign Finance Reform Act's expenditure and contribution limits violate First Amendment free speech protections).

In *Buckley v. Valeo,* 424 U.S. 1, 79–80, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the United States Supreme Court upheld campaign finance reform disclosure provisions, provided that the expenditures covered by such disclosure provisions are funds used for communications that "expressly advocate the election or defeat of a clearly identified candidate." The Court also set forth guidelines to determine what constitutes express advocacy. In a frequently cited footnote, the Court provided a list of words or phrases that constitute express advocacy, including "vote for," "elect," "support," "cast your ballot for," "vote against," "defeat," and "reject." *Id.* at 44 n. 52, 96 S.Ct. 612.

The *Buckley* Court made an important distinction between supporting and expressly advocating an *issue,* on the one hand, and supporting and expressly advocating a *candidate* for election, on the other hand. The Court held that expenditures for issue advocacy are *not* subject to regulation because the "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of a system of government established by our Constitution." *Id.* at 14, 96 S.Ct. 612.

The Supreme Court stated:

> Public discussion of public issues which are also campaign issues readily and often unavoidably draws in candidates and their positions, their voting records and other official conduct. Discussions of those issues, and as well more positive efforts to influence public opinion on

them, tend naturally and inexorably to exert some influence on voting at elections.

*Id.* at 42 n. 50, 96 S.Ct. 612 (quoting *Buckley v. Valeo,* 519 F.2d 821, 875 (D.C.Cir.1975)).

The *Buckley* Court also held that a group is not a "political committee" unless its "major purpose" is to influence elections. 424 U.S. at 79, 96 S.Ct. 612. The Court explained:

> The general requirement that "political committees" and candidates disclose their expenditures could raise similar vagueness problems, for "political committee" is defined only in terms of amount of annual "contributions" and "expenditures," and could be interpreted to reach groups engaged purely in issue discussion. The lower courts have construed the words "political committee" more narrowly. To fulfill the purposes of the Act they need only encompass organizations that are under the control of a candidate or *the major purpose of which is the nomination or election of a candidate.* Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.

*Id.* (emphasis added; footnotes omitted).

This construction of the term "political committee" as applied to non-candidate organizations has come to be known as the "major purpose" test. *See Fed. Election Comm'n v. Akins,* 524 U.S. 11, 29, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (addressing whether certain expenditures by an organization were membership communications in connection with application of the " 'major purpose" test).

The Supreme Court next addressed the issue of campaign finance reform in *Federal Election Commission v. Massachusetts Citizens for Life,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (*MCFL* ). MCFL was a nonprofit corporation that engaged in educational, political, and other activities to foster respect for human life and defend the right to life. It published a newsletter for those expressing support for the organization and distributed a "Special Edition" that con-

tained the phrase, "Everything You Need to Know to Vote Pro–Life." The newsletter listed the candidates for each state and federal office in the state and identified whether each candidate supported or opposed MCFL's views. Although some 400 candidates were running for office, the newsletter included photographs of only thirteen candidates and identified them as particularly supportive of MCFL's views.

The Supreme Court held that MCFL's publication and distribution of the Special Edition newsletter constituted express advocacy for the election of the favored candidates, stating:

> *Buckley* adopted the "express advocacy" requirement to distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons. We therefore concluded in that case that a finding of "express advocacy" depended upon the language such as "vote for," "elect," "support," etc. Just such an exhortation appears in the "Special Edition." The publication not only urges voters to vote for "pro-life" candidates, but also identifies and provides photographs of specific candidates fitting that description.

*Id.* at 249, 107 S.Ct. 616 (citation omitted). Thus, under MCFL, a communication constitutes express advocacy if it contains an exhortation that urges voters to take action and identifies specific candidates.

In *McConnell v. Federal Election Commission,* 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), the Court distinguished restrictions on campaign *expenditures* from restrictions on campaign *contributions,* explaining that "contribution limits, unlike limits on expenditures, 'entai[l] only a marginal restriction upon the contributor's ability to engage in free communication,' " *id.* at 134–35, 124 S.Ct. 619 (quoting *Buckley,* 424 U.S. at 20, 96 S.Ct. 612), and that the Court has "consistently applied less rigorous scrutiny to contribution restrictions aimed at the prevention of corruption and the appearance of corruption." *Id.* at 138 n. 40, 124 S.Ct. 619; *see Sanger v. Dennis,* 148 P.3d at 415.

Recently, in *Colorado Right to Life Committee, Inc. v. Coffman,* 498 F.3d at 1141–42, the Tenth Circuit Court of Appeals addressed a constitutional challenge to the Amendment very similar to the one before us. The case was brought against the Colorado Right to Life Committee (CRLC), a nonprofit corporation, whose stated purposes were to promote respect for human life and to educate the community regarding the dangers of abortion, euthanasia, infanticide, and compulsory sterilization, and it sought to achieve these purposes "by communicating with the public regarding such issues, providing information about elected officials, and encouraging Colorado citizens to communicate with their representatives on these issues." *Colo. Right to Life Comm., Inc. v. Coffman,* 498 F.3d at 1142.

At issue there was whether CRLC was subject to the Amendment's reporting requirements and whether sections 3(4) (banning corporations from making expenditures that expressly advocate the election or defeat of a candidate), 6(2) (banning corporations from funding electioneering communications), and 2(12) (defining political committee) were unconstitutional as applied to CRLC. The federal district court enjoined the enforcement of section 2(12)(a) against CRLC, concluding it was unconstitutional as applied to CRLC, because the definition of "political committee" does not comply with the "major purpose" test required by *Buckley.* As the district court explained, "*Buckley* establishes that regulation should be tied to groups controlled by candidates or which have a 'major purpose' of electing candidates," and because "[i]t [was] not clear whether the facts presented would expose CRLC to 'political committee' regulation," the district court assumed they would and ruled on an as-applied basis. *Colorado Right to Life Comm., Inc. v. Davidson,* 395 F.Supp.2d 1001, 1019 n. 22, 1020 (D.Colo.2005), *aff'd,* 498 F.3d 1137.

The federal appeals court upheld the district court's ruling, observing that CRLC's communications "have included voter guides, articles on its website, radio ads, pre-recorded phone messages, direct-mail, and email," plus the following activities:

· In August 2002, before the state primary election, CRLC arranged for a pre-recorded phone call to be made to identified pro-life supporters in Morgan County before a primary election in which [two candidates] were running. The message compared the views of the two candidates on abortion, and asked the recipients to urge [one candidate] to "abandon his pro-abortion views" and to "thank" [the other candidate] for defending unborn children. CRLC spent $335 on this activity.

· In August 2002, CRLC, in partnership with the Christian Coalition, sent a form letter to registered pro-life voters in House District 55 comparing the two candidates['] views on abortion. This letter asked recipients, when voting in the election, to help stop [one candidate's] "extreme pro-abortion agenda," as well as urging recipients to "thank" [the other candidate] for being "solidly pro-life." CRLC spent $207 on this letter.

· In August 2002, CRLC published *The Colorado LifeLight,* with a subtitle "Special Report–2002 Voter Guide." Although the front page was devoted to general information, the remainder of the publication reported the responses of 42 candidates for state or federal office to a CRLC questionnaire. In the October/November 2002 *Colorado LifeLight,* CRLC urged recipients to vote no on three ballot measures and published a list of Colorado candidates who had been endorsed by the National Abortion Rights Action League.

· In the 2002 general election, CRLC ran radio ads on Denver and Longmont stations comparing the partial-birth abortion views of [the two] Fourth Congressional District candidates.... Around that same time, CRLC also ran other radio ads encouraging people in [one candidate's] district to call him and ask him to pass the Born Alive Infant Protection Act out of his senate committee.

498 F.3d at 1143.

Although CRLC was a corporation, it was not a business corporation, and the federal court of appeals observed that it bore a "close resemblance to a voluntary political

association, much like the one at issue in *MCFL."* *Id.* at 1150. The appeals court also concluded that CRLC's acceptance of de minimis contributions from business corporations did not transform it into a "potential conduit for corporate funding of political activity." *Id.* (quoting *Fed. Election Comm'n v. Nat'l Rifle Ass'n,* 254 F.3d 173, 192 (D.C.Cir. 2001)).

The appeals court refused to apply the narrowing construction to the Amendment that was urged by the Colorado Secretary of State to remedy the constitutional infirmity, and stated:

> The [Colorado] Secretary [of State] maintains that if we hold that the "major purpose" test survives *McConnell,* then § 2(12)'s definition of political committee as applied to CRLC is readily susceptible to a narrowing construction that will remedy any constitutional infirmity presented by the omission of the "major purpose" test. He avers that because Colorado's definition of political committee is substantially similar to the federal definition, and Colorado "has used federal campaign law as a template for its campaign laws," § 2(12) should withstand constitutional scrutiny.
>
> Generally, we consider the application of a narrowing construction in the context of a facial challenge. As we later discuss, we decline to reach CRLC's facial challenge to § 2(12). However, regardless of whether we characterize the Secretary's argument as addressing a facial or as-applied challenge, we agree with the district court that the statute does not lend itself to a narrowing construction.
>
> . . . .
>
> Here, importantly, we note that Article XXVIII's definition of "issue committee" includes the very "major purpose" test at issue, suggesting that the legislature was well aware of *Buckley's* requirements when it drafted Article XXVIII. The inclusion of the "major purpose" test in § 2(10)(a) indicates that the decision *not* to include this requirement in the definition of political committee was deliberate and consistent with the state citizenry's intent. Because we cannot re-write state laws to conform with constitutional requirements where doing so would be inconsistent with legislative, or here, the state citizenry's intent, we hold that the district court properly concluded that § 2(12) as applied to CRLC could not [be] saved by incorporating a narrowing construction.

*Colo. Right to Life Committee, Inc. v. Coffman,* 498 F.3d at 1154–55 (citations omitted).

■ Although ACF is an unincorporated nonprofit association, rather than a nonprofit corporation like CRLC, and the two have very different political goals, both entities have engaged in political advocacy pertinent to candidate elections and related issues of public concern. In fact, CRLC's activities, as described by the court and quoted above, were considerably more extensive than the airings of the Eddie Haskell radio advertisement. Furthermore, the activities at issue of both entities involved expenditures, not contributions, and therefore, the restrictions upon them are subject to strict scrutiny. *See McConnell v. Fed. Election Comm'n,* 540 U.S. at 138 n. 40, 124 S.Ct. 619; *Sanger v. Dennis,* 148 P.3d at 415.

■ We are persuaded by the reasoning of the court in *Colorado Right to Life Committee, Inc. v. Coffman.* But unlike in that case, the record before us does not permit us to determine whether the "major purpose" test required by *Buckley,* 424 U.S. at 79, 96 S.Ct. 612, has been satisfied as to ACF. At the hearing before the ALJ, ACF raised the "major purpose" issue, but the ALJ did not make any factual findings regarding it or address it further. Rather, the ALJ proceeded to rule as a matter of law that ACF was transformed into a political committee when it aired the radio advertisements in 2004, and it then imposed the penalty on ACF.

We recognize that the ALJ lacked authority to enter conclusions of law resolving constitutional issues. Nevertheless, it was the ALJ's prerogative to make findings of fact that would enable an appellate court to resolve those constitutional issues.

Accordingly, we conclude the order must be reversed, the penalty must be vacated, and the case must be remanded to the ALJ.

On remand, the ALJ shall conduct further proceedings, and guided by *Colorado Right to Life Committee, Inc. v. Coffman,* and other relevant authority, he or she shall determine whether ACF's "major purpose" in 2004 was the nomination or election of candidates. *See Buckley,* 424 U.S. at 79, 96 S.Ct. 612. After making that determination, the ALJ shall make additional findings of fact whether ACF was a "political committee" in 2004, and such other findings as are necessary to resolve the remaining issues. *See Fed. Election Comm'n v. Akins,* 524 U.S. at 18, 27, 118 S.Ct. 1777 (concluding a group is not a "political committee" unless its "major purpose" is the nomination or election of candidates).

Given our conclusion, we need not address ACF's additional contentions relating to the propriety of the penalty or the issues raised by Gilbert in his cross-appeal.

The order is vacated, and the case is remanded for further proceedings in accordance with the views expressed in this opinion.

Judge LOEB and Judge TERRY concur.