**INDEPENDENCE INSTITUTE, a Colorado non-profit corporation, Plaintiff–Appellant,**

v.

**Mike COFFMAN, in his official capacity as Secretary of State of the State of Colorado, Appellee.**

No. 07CA1151.

Colorado Court of Appeals, Div. II.

Nov. 26, 2008.

Certiorari Denied June 1, 2009.

1132

Jackson Kelly PLLC, Shayne M. Madsen, Denver, Colorado; William H. Mellor, III, Steven M. Simpson, Arlington, Virginia, for Plaintiff–Appellant.

John W. Suthers, Attorney General, Maurice G. Knaizer, Deputy Attorney General, Monica M. Marquez, Assistant Solicitor General, Denver, Colorado, for Appellee.

Opinion by Judge TAUBMAN.

In this campaign finance law dispute, plaintiff, the Independence Institute, appeals the summary judgment entered by the trial court in favor of Mike Coffman, in his official capacity as Secretary of State of Colorado. Because we conclude the definition of "a major purpose" in article XXVIII, section 2(10), of the Colorado Constitution is not unconstitutionally vague or overbroad on its face, we affirm the trial court's judgment.

## I. Background

Founded in 1985, the Independence Institute is a nonprofit policy research organization located in Golden, Colorado. Its purpose is "to educate the public about the benefits of the free market and the dangers of expansive government." To do so, the Independence Institute provides policy makers, legislators, business leaders, the media, and Colorado citizens with educational materials about policy issues with which it is concerned.

In the spring of 2005, the General Assembly referred two tax and financing issues—Referenda C and D—to the November ballot. Referendum C would allow the state to retain revenues over a five-year period that would otherwise have to be refunded to taxpayers under the Taxpayer Bill of Rights (TABOR), Colo. Const. art. X, § 20. Referendum D was intended to work in conjunction with Referendum C, allowing the state to issue bonds for certain projects and to trigger provisions in Referendum C to allow the state to spend an additional $100 million each year if Referendum D passed.

Amid wide-ranging campaigns supporting and opposing the adoption of Referenda C and D, the Independence Institute, through its fiscal policy center, initiated an education campaign to inform the public about the impact of Referenda C and D on taxes and government spending. As part of its education campaign, the Independence Institute aired three radio commercials, which provided information on the tax implications of Referendum C, directed listeners to a website to learn more information, but did not explicitly ask listeners to vote yes or no on the referendum. Subsequently, the voters approved Referendum C but not Referendum D.

This dispute began in August 2005 when Richard Evans, an agent of "Vote Yes on C and D," an issue committee promoting the adoption of statewide referenda during the 2005 election, filed an administrative complaint with the Secretary of State. Evans alleged that the Independence Institute was an issue committee opposed to those referenda and had failed to comply with registration, reporting, and disclosure requirements of article XXVIII and the Fair Campaign Practices Act (FCPA), sections 1–45–101 to –115, C.R.S.2008. As required by section 9(2)(a) of article XXVIII, the Secretary referred Evans's complaint to the Office of Administrative Courts for an administrative hearing.

While the administrative proceedings were pending, the Independence Institute filed this lawsuit against Coffman's predecessor, alleging constitutional challenges to article XXVIII and the disclosure provisions of the FCPA. The trial court denied the Independence Institute's request for preliminary injunction to enjoin the administrative hearing scheduled for October 12, 2005. Accordingly, the administrative hearing went forward, and a few days after the election, the administrative law judge (ALJ) issued a decision concluding that the Independence Institute was not an "issue committee" with respect to its activities concerning Referenda C and D and therefore had not violated the registration and disclosure provisions in article XXVIII or the FCPA.

Notwithstanding its favorable decision from the ALJ, the Independence Institute pursued this litigation, maintaining that the constitutional and statutory provisions at issue were unconstitutional on their face. In May 2007, the district court granted summary judgment in favor of Coffman on all of the Independence Institute's claims.

## II. Issue Committee Provisions

■ Article XXVIII establishes Colorado's campaign and political finance laws as constitutional provisions. The purpose of the article is to require certain disclosures of contributions made to influence election outcomes not only as to political candidates, but as to ballot issues as well. *See* Colo. Const. art. XXVIII, § 1. The requirements ensure that large contributions made to influence election outcomes are not concealed, and that special interest groups cannot disproportionately influence elections outcomes. *Id; see also Colorado Citizens for Ethics in Gov't v. Comm. for Am. Dream,* 187 P.3d 1207, 1215–16 (Colo.App.2008) (*CCEG* ).

■ Article XXVIII defines an issue committee as:

any person, other than a natural person, or any group of two or more persons, including natural persons:

(I) [t]hat has *a major purpose* of supporting or opposing any ballot issue or ballot question; *or*

(II) [t]hat has accepted or made contributions or expenditures in excess of two hundred dollars to support or oppose any ballot issue or ballot question.

Colo. Const. art. XXVIII, § 2(10)(a) (emphasis added). By regulation, Coffman has interpreted the emphasized word "or" to mean "and." *See* Sec'y of State Campaign & Political Finance Rules 1.7, 8 Code Colo. Regs. 1505-6. When an organization is deemed an issue committee, it must fully comply with reporting requirements set forth in article XXVIII and the FCPA.

Among the requirements, all issue committees must register with the Secretary of State before accepting or making any contributions and disclose the name and address of each person who contributed $20 or more, including the occupation and employer of each person who has made a contribution of $100 or more. § 1–45–108(1)(a)(I)–(II), C.R.S.2008.

All issue committees must regularly report to the Secretary of State the balance of funds at the beginning of the reporting period, the amounts of contributions received, and expenditures made during the reporting period. § 1–45–108(2)(b), C.R.S.2008. Additionally, "[a]n issue committee shall be considered open and active until [it] affirmatively" terminates its designation as an issue committee with the state. Colo. Const. art. XXVIII, § 2(10)(c).

The provisions at issue here concern "multi-purpose issue committees." Although that term is not defined in article XXVIII, it was defined in a regulation adopted by the Secretary of State after the ALJ issued her administrative ruling but before the district court ruled on the parties' cross-motions for summary judgment. The regulation defines a multi-purpose issue committee as "an issue committee whose purposes are not limited to supporting or opposing ballot issues or ballot questions." *See* Secretary of State Campaign & Political Finance Rules 3.8, 8 Code Colo. Regs. 1505-6. The parties here agree that the Independence Institute is not a single-purpose issue committee.

The questions before us now relate only to the propriety of the trial court's summary judgment. Neither the trial court's denial of the Independence Institute's motion for preliminary injunction nor the ALJ's decision in favor of the Independence Institute is before us here.

## III. Standard of Review

■ We review a trial court's grant of summary judgment de novo. *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.,* 901 P.2d 1251, 1256 (Colo.1995). Summary judgment is appropriate only if the pleadings and supporting documents demonstrate there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.; see* C.R.C.P. 56(c).

■ Interpretation of a constitutional provision is a question of law that we review de novo. *Rocky Mountain Animal Defense v. Colo. Div. of Wildlife,* 100 P.3d 508, 513 (Colo.App.2004) (*RMAD* ). In addition, since the judgment relates to political speech, we review the entire record "to ensure that the judgment rendered does not intrude on the right of free speech." *See Holliday v. Reg'l*

*Transp. Dist.*, 43 P.3d 676, 681 (Colo.App. 2001).

### IV. Vagueness and Overbreadth

The Independence Institute argues that Colorado Constitution article XXVIII, § 2(10)(a), which defines "issue committee," is unconstitutionally vague and overbroad on its face. We disagree.

■ In construing a constitutional amendment, we must ascertain and give effect to the intent of the electorate adopting the amendment. *Zaner v. City of Brighton*, 917 P.2d 280, 283 (Colo.1996); *CCEG*, 187 P.3d at 1215 (citing *RMAD*, 100 P.3d at 513–14). To determine that intent, we first look at the plain and ordinary meaning of the words in the amendment without engaging in narrow or overly technical constructions. *RMAD*, 100 P.3d at 514. We may also discern the electorate's intent by considering the ballot title, the submission clause, the Bluebook, and other materials. *Id.* Moreover, if the language is ambiguous or reasonably susceptible of more than one interpretation, then we consider the objective to be accomplished and the "mischief to be avoided." *Zaner*, 917 P.2d at 283. Finally, we must consider the amendment as a whole, and if possible, interpret the provision in harmony with other provisions to avoid a conflict. *Id.*

■ General rules of statutory construction apply when interpreting citizen-initiated measures. *RMAD*, 100 P.3d at 514; *see also Bickel v. City of Boulder*, 885 P.2d 215, 228 n. 10 (Colo.1994) (courts may interpret citizen-initiated measures using the general rules of statutory construction); *Nevada Tax Comm'n v. Bernhard*, 100 Nev. 348, 683 P.2d 21, 23 (1984) (laws approved by referendum are interpreted using general rules of statutory construction).

■ State constitutional provisions that violate federal constitutional law can be held invalid facially or as applied. *Alliance for Colorado's Families v. Gilbert*, 172 P.3d 964, 968 (Colo.App.2007). As-applied constitutional challenges attempt to invalidate a law only in the circumstances in which a party has acted or proposes to act; thus, a law that is held invalid as applied is not rendered completely inoperative. *Sanger v. Dennis*, 148 P.3d 404, 410 (Colo.App.2006). In contrast, a party who brings a facial challenge must establish that the law is invalid in all respects and cannot be constitutionally applied in any circumstance. *Id.* at 411. A party challenging a constitutional amendment must show it to be unconstitutional beyond a reasonable doubt. *Evans v. Romer*, 854 P.2d 1270, 1274 & n. 6 (Colo.1993) (presumption of constitutionality of amendment to Colorado Constitution is more forceful than similar presumption with respect to statutes, in recognition of "the broad powers which our state constitution places in the people"); *People ex rel. Tate v. Prevost*, 55 Colo. 199, 134 P. 129 (1913).

■ We are also mindful that facial challenges are disfavored. *Wash. State Grange v. Wash. State Republican Party*, —— U.S. ——, 128 S.Ct. 1184, 1191, 170 L.Ed.2d 151 (2008). Facial challenges are disfavored because (1) courts may be forced to rely on speculation, (2) there is a risk of premature statutory interpretation, (3) courts may have to anticipate questions of constitutional law when unnecessary, (4) courts may have to formulate constitutional rules broader than those required by the precise facts to which they would be applied, and (5) they may prevent the implementation of laws that embody the will of the people. *Id.*

As discussed below, we conclude that article XXVIII, § 2(10)(a) is neither facially vague nor overbroad.

### A. Vagueness

Initially, the Independence Institute asserts that the trial court erred in using an improper standard of vagueness, rather than the stricter standard that applies in First Amendment cases. Coffman does not dispute that the trial court erred in this regard, but simply contends that the Independence Institute has not articulated how the stricter test dictates a different result here. Accordingly, we apply the stricter vagueness test applicable to First Amendment cases.

■ A law that is unduly vague violates the Due Process Clause of the Four-

teenth Amendment. *Parrish v. Lamm,* 758 P.2d 1356, 1367 (Colo.1988) (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). The vagueness doctrine helps to ensure that a law is sufficiently definite so that citizens will be alerted to the conduct that is proscribed and they may act accordingly, and so that the law will not be arbitrarily applied. *Regency Services Corp. v. Bd. of County Comm'rs,* 819 P.2d 1049, 1055 (Colo.1991).

■■■■ A law is vague where persons of ordinary intelligence must necessarily guess as to its meaning and differ as to its application. *People v. Gomez,* 843 P.2d 1321, 1322 (Colo.1993); *People v. Becker,* 759 P.2d 26, 31 (Colo.1988). However, laws concerning First Amendment protected activities are analyzed under stricter vagueness terms. *Parrish,* 758 P.2d at 1366 (citing *Flipside,* 455 U.S. at 498–99, 102 S.Ct. 1186). The First Amendment demands specificity in a law so that individuals may assess the burden on their rights to free speech and free association and make informed decisions before acting. *Common Sense Alliance v. Davidson,* 995 P.2d 748, 756 (Colo.2000).

■■■■ We must construe a constitutional provision consistent with its purpose, "to avoid the shoals of vagueness." *See Buckley v. Valeo,* 424 U.S. 1, 77–78, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Because a constitutional provision must be specific enough to give fair warning of the proscribed conduct and, at the same time, be general enough to address the essential problem under varied circumstances, due process does not require that the provision be drafted with mathematical exactitude. *See People ex rel. City of Arvada v. Nissen,* 650 P.2d 547, 550 (Colo.1982).

■■■■ When reviewing a vagueness challenge, the court's duty is to construe the challenged provision "so as to uphold its constitutionality whenever a reasonable and practical construction may be applied to the statute." *Loonan v. Woodley,* 882 P.2d 1380, 1389 (Colo.1994) (quoting *People v. Buckallew,* 848 P.2d 904, 907 (Colo.1993)); *see also Buckley,* 424 U.S. at 77–78, 96 S.Ct. 612 (construing provisions of Federal Election Campaign Act of 1971 narrowly to avoid facial invalidity based on grounds of vagueness and overbreadth); *Nat'l Right to Work Legal Defense & Educ. Foundation, Inc. v. Herbert,* 581 F.Supp.2d 1132, 1148 (D.Utah 2008) (similarly imposing narrowing construction on Utah election statutes).

■■■■ The Independence Institute contends that the definition of issue committee restricts freedom of speech and association because it provides no guidance as to when multi-purpose issue committees must comply with the constitutional and statutory registration, reporting, and disclosure provisions. More specifically, it asserts that the phrase "a major purpose" in article XXVIII, § 2(10)(a)(I) is unconstitutionally vague because it lacks the precision accorded the phrase "the major purpose" in *Buckley.* We disagree.

■■■■ Because article XXVIII does not define the phrase "a major purpose," we first look at the ordinary and plain meaning of the phrase. While the Independence Institute focuses on the alleged vagueness of "a" and Coffman relies on the apparent clarity of "major" and "purpose," we focus on the language of the entire phrase. This is the approach used by the United States Supreme Court in *Buckley* in defining *"the major purpose"* as the one, central purpose for which an organization is created. *Buckley,* 424 U.S. at 79, 96 S.Ct. 612.

■■■■ There is no dispute that the phrase "a major purpose" applies when a group has one central purpose to support or oppose a ballot initiative. However, the Independence Institute argues that for groups that have multiple purposes, the determination of whether one of those purposes is "major" requires a subjective determination of the relative status of that purpose. It argues that article XXVIII does not provide guidance to multi-purpose groups in this regard. Thus, it contends, a multi-purpose organization cannot determine whether any of its purposes is "major," thereby subjecting it to the registration, reporting, and disclosure requirements of article XXVIII and the FCPA.

In *Buckley,* the United States Supreme Court held that defining the phrase "the

major purpose" to designate groups that have a single major purpose of campaigning is appropriate to ensure that all entities subjected to the burdens of political committee designation are engaged primarily in regulable, election-related speech. *See North Carolina Right to Life, Inc. v. Leake,* 525 F.3d 274, 289 (4th Cir.2008) (*NCRL* ).

In *NCRL,* the Fourth Circuit struck down as unconstitutionally vague the definition of political committee in a North Carolina statute that, like the constitutional provision at issue here, used the term "a major purpose." The majority held that "if an organization explicitly states, in its bylaws or elsewhere, that influencing elections is its primary objective, or if the organization spends the majority of its money on supporting or opposing candidates, that organization is under 'fair warning' that it may fall within the ambit of *Buckley's* test." *Id.*

However, the *NCRL* court concluded that the North Carolina statute "provides absolutely no direction as to how North Carolina determines an organization's 'major purposes.'" *Id.* The court noted that NCRL had many objectives other than supporting or opposing political candidates. *Id.*

The court continued:

In this sort of setting, it becomes difficult to understand when the "purpose" of supporting or opposing a candidate becomes "a major purpose." Is a purpose "major" if an organization has only one or two other purposes? Is there a share of total expenditures that determines when a purpose is "major"? An absolute dollar amount? Or perhaps frequency of participation is the relevant criteria: maybe if an organization engages in electoral advocacy three times during one election cycle then the support or opposition of a candidate is "a major purpose"? Given the vagueness of [the statute's] test, it is hard to argue with the plaintiff's contention that, in designating organizations as political committees, North Carolina is essentially handing out speeding tickets without "telling anyone . . . the speed limit."

*Id.* at 290.

Finally, the court noted that a party might be persuaded not to exercise its right to engage in political speech if faced with the costly and time-consuming process of complying with the state's regulatory requirements. In short, it concluded, "[u]nguided regulatory discretion and the potential for regulatory abuse are the very burdens to which political speech must never be subject." *Id.*

In contrast, the dissenting judge in *NCRL* concluded that the phrase "a major purpose" was not unconstitutionally vague. According to the dissent, whether a regulator is identifying "a major purpose" or "the major purpose" of an organization, he or she considers the same evidence in determining whether electoral advocacy constitutes a considerable or principal portion of the organization's total activities. Thus, the dissent concluded, "an organization is just as able to determine whether electoral advocacy comprises one of its major purposes as it is able to determine whether such activity is 'the major purpose.'" *NCRL,* 525 F.3d at 328–29 (Michael, J., dissenting).

The dispute between the majority and the dissent in *NCRL* can be placed in context by considering the more recent opinion in *National Right to Work Legal Defense & Education Foundation, Inc. v. Herbert,* which reaffirmed "the major purpose" test in *Buckley,* and suggested that some regulation of protected speech might be constitutionally permissible. There, the federal district court struck down as unconstitutional a Utah statute that defines a "political issues committee" as an entity that makes any disbursements to influence, or to intend to influence, directly or indirectly a ballot proposal. 581 F.Supp.2d at 1153, 2008 WL 4181336, at * 17. The court held that limiting the definition of "political issues committee" as in *Buckley* to entities whose primary or only activity is within the core of Congress's power to regulate politically protected speech is not unconstitutional. It concluded, "[w]ith such a broad definition, Utah does not even attempt to comply with *Buckley's* 'major purpose' requirement, and has pushed the reach of political committee regulation beyond constitutional limits." *Id.*

In *CCEG*, another division of this court recently interpreted the section of article XXVIII concerning electioneering communications. 187 P.3d at 1216. That division narrowly interpreted the "regular business" exception in section 2(7)(b)(III) in a manner consistent with the electorate's intent in adopting it. Similarly, "a major purpose" can be applied to give effect to the electorate's intent in adopting article XXVIII to require disclosure of contributions made to entities that exist to influence election outcomes as to ballot issues, and not to require disclosure of contributions to entities that do not have such influence as a major purpose.

Here, article XXVIII uses "a major purpose" instead of *Buckley's* "the major purpose." Coffman argues, and we agree, that the phrase "a major purpose," is not inherently vague. We perceive no basis to conclude that this phrase is invalid in all respects or that it cannot be constitutionally applied to any multi-issue committee.

To determine whether it has, as "a major purpose," engaging in ballot advocacy, a multi-issue committee, for example, could look to and compare the purposes stated in its charter, articles of incorporation, and by-laws; the purposes of its activities and annual expenditures; and the scope of issues addressed in its print and electronic publications. Constitutional provisions need not be so exact as to eliminate any need for such fact-specific analysis. Thus, the fact that a multi-purpose committee would have to look to its own circumstances does not render the phrase "a major purpose" unconstitutional. To the contrary, the obvious relevance and ready availability of such information means that any multi-issue committee can assess the burden on its rights to free speech and free association and make an informed decision before undertaking ballot advocacy.

Here, the ALJ considered the length of time the Independence Institute had been in existence, its original purpose, its organizational structure, the various issues with which it had been involved, and the amount of money expended on the radio ads in proportion to its annual budget. The trial court relied on this fact-specific inquiry to address the Independence Institute's vagueness challenge.

Accordingly, we conclude that the Independence Institute has not proved that the term "a major purpose" is invalid in all respects and cannot be constitutionally applied in any circumstances. Therefore, we conclude that article XXVIII is not unconstitutionally vague on its face. Thus, as a matter of law, the trial court correctly granted Coffman's motion for summary judgment on this issue.

### B. Overbreadth

The Independence Institute similarly contends that the definition of issue committee in article XXVIII is unconstitutionally overbroad on its face because it reaches groups, like the Independence Institute, that do not have a single major purpose of opposing or supporting ballot initiatives. We disagree.

A law is facially overbroad if it sweeps within its reach a substantial amount of activity that is constitutionally protected. *People v. Shepard*, 983 P.2d 1, 3 (Colo.1999) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). A law that substantially burdens speech and other protected First Amendment conduct is overbroad. *Bd. of Educ. v. Wilder*, 960 P.2d 695, 702–03 (Colo.1998)(citing *Broadrick*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830); *Aguilar v. People*, 886 P.2d 725, 727 (Colo. 1994).

Further, any party can bring an overbreadth facial challenge to protect the rights of third parties whose First Amendment rights may be "chilled" by the law. *People ex rel. Tooley v. Seven Thirty–Five East Colfax, Inc.*, 697 P.2d 348, 355 (Colo. 1985).

Normally, a facial overbreadth challenge must establish that no set of circumstances exists under which the act would be valid. *Wash. State Grange v. Wash. State Republican Party*, —— U.S. at ——, 128 S.Ct. at 1190. However, in the First Amendment context, a party may establish a law is facially overbroad when a "substantial number" of its applications are unconstitutional in

relation to the statute's plainly legitimate sweep. *Id.* at ——, 128 S.Ct. at 1191 n. 6 (citing *New York v. Ferber,* 458 U.S. 747, 769–71, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)).

A law will be invalidated when it threatens to deter others from engaging in First Amendment protected activities. *People v. Ryan,* 806 P.2d 935, 939 (Colo.1991). We must be cautious in invalidating a law as facially overbroad and do so only as a last resort. *Id.* (citing *Broadrick,* 413 U.S. at 613, 93 S.Ct. 2908).

The Independence Institute argues that article XXVIII is overbroad on its face because if an entity erred on the side of caution, it would report itself as a multi-purpose issue committee and thereby be regulated in its activities that might not otherwise be regulable under the First Amendment. Conversely, if such an entity determined that it did not have a major purpose of ballot advocacy, yet participated in some ballot advocacy, it would then be subject to fines and penalties if it were later determined to fall under the definition of issue committee.

As noted, Coffman promulgated rules to limit the disclosure and termination requirements for multi-purpose issue committees. Those rules, which define a "multi-purpose" issue committee, combined with the fact-specific inquiry discussed in our vagueness analysis, provide sufficient guidance as to when a multi-purpose group has "a major purpose" of supporting or opposing a ballot measure.

As so interpreted, article XXVIII, section 2(10)(a) does not sweep a substantial amount of protected speech within its application.

We are aware that some multi-purpose organizations may decline to engage in ballot advocacy for fear of being subject to a complaint and attendant administrative proceedings; however, as the dissent in *NCRL* reasoned, we conclude that article XXVIII, section 2(10)(a), does not burden a *substantial* amount of constitutionally protected speech. *NCRL,* 525 F.3d at 289.

Accordingly, we hold that the Independence Institute has not proved the definition of issue committee is invalid in all respects and cannot be constitutionally applied in any

circumstances. Therefore, we conclude that the definition is not unconstitutionally overbroad on its face. Thus, as a matter of law, the trial court correctly granted Coffman's motion for summary judgment on this issue.

## V. Burdensomeness of Registration and Disclosure Requirements

The Independence Institute maintains that the registration and disclosure requirements contained in section 1–45–108 and article XXVIII, section 3(9) unconstitutionally burden First Amendment rights. Although we conclude that the trial court erred in dismissing this claim on the basis that the Independence Institute lacks standing, we also conclude that this claim is now barred by an order of the trial court.

The trial court rejected the Independence Institute's contention "that the registration and reporting requirements of the FCPA are onerous and unduly burdensome because they disproportionately impact small educational groups and issue advocacy organizations."

It then concluded that while the Independence Institute had asserted a facial constitutional claim, upon closer examination the challenge was really an as-applied argument and therefore, the Independence Institute lacked standing to raise it.

On appeal, the Independence Institute asserts that it had standing to bring this claim because standing is assessed at the time a lawsuit is filed, and, when the Independence Institute filed its complaint, it was subject to an actual, ongoing prosecution for violation of the FCPA's reporting requirements.

A party's standing is assessed at the time a lawsuit is filed. *Grossman v. Dean,* 80 P.3d 952, 958 (Colo.App.2003). Mootness, in contrast, requires courts to look at circumstances that have arisen after a complaint has been filed. *See Clark v. City of Lakewood,* 259 F.3d 996, 1006 (9th Cir.2001).

Here, the Independence Institute had standing to assert its claim when it filed the lawsuit because it was then subject to administrative proceedings on the basis of an alleged failure to comply with article XXVIII

and the FCPA. Coffman has not asserted that this issue is moot, and therefore, we do not address the question of mootness.

■ Nevertheless, Coffman argues that we should not address the Independence Institute's claim on the merits because it is barred by an order of the trial court. We agree.

On appeal, the Independence Institute has recast its claim regarding the burdensomeness of the registration and disclosure requirements. It now argues that article XXVIII, section 3(9) and section 1–45–108 unconstitutionally burden groups, like the Independence Institute, that only occasionally engage in ballot issue advocacy but lack a central organizing or major purpose of supporting or opposing ballot issues. It no longer maintains that the reporting and registration requirements are unduly burdensome because they disproportionately impact small educational groups and issue advocacy organizations.

However, on December 14, 2005, about one month after the ALJ's decision, the trial court issued an order noting that the Secretary of State had withdrawn the motion to dismiss as it related to the Independence Institute's facial constitutional challenges. The court added "that its determination in this action shall be limited to such facial challenges and shall not extend to any as-applied challenges."

On appeal, the Independence Institute now contends that the registration and disclosure requirements "are unconstitutional as-applied to multi-purpose issue committees." Under these circumstances, we conclude that (1) the Independence Institute has modified this claim from a facial to an as-applied challenge to the registration and reporting requirements, and (2) as an as-applied argument, it may not be raised for the first time on appeal. *See Estate of Stevenson v. Hollywood Bar & Cafe, Inc.*, 832 P.2d 718, 721 (Colo.1992).

Accordingly, we conclude, albeit for a different reason, that the trial court properly rejected the Independence Institute's burdensomeness claim. *See Stuart v. Bd. of County Comm'rs*, 699 P.2d 978 (Colo.App.

1985)(court may affirm for reasons different from those stated by the trial court).

## VI. Violation of Right to Anonymous Speech and Association

■ The Independence Institute contends that the disclosure requirements in section 1–45–108 violate the right to engage in anonymous speech and association by requiring those who contribute as little as $20 to support or oppose ballot issues to disclose their identities and addresses on the Secretary of State's website and requiring those who contribute $100 or more also to disclose their occupations and employers. We disagree.

The United States Supreme Court has recognized that anonymous speech and association are fundamental rights and, outside the context of campaign finance laws that apply to political candidates, a state must demonstrate a compelling interest and narrow tailoring to avoid infringing on those rights. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343, 347, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995); *Buckley*, 424 U.S. at 64–66, 96 S.Ct. 612 (compelled disclosure implicates privacy of association and belief); *NAACP v. Alabama*, 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

However, the Supreme Court has also recognized that while disclosure of contributions to candidates and parties may deter some potential contributors, and may even expose some to harassment and retaliation, disclosure requirements often appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist in enacting the Federal Election Campaign Act of 1971. *Buckley*, 424 U.S. at 68, 96 S.Ct. 612.

Therefore, the *Buckley* Court required challengers to disclosure requirements to show "a reasonable probability that the compelled disclosure of a party's contributors' names would subject them to threats, harassment, or reprisals from either Government officials or private parties." *Id.* at 74, 96 S.Ct. 612. The Supreme Court indicated that such proof could include specific evidence of past or present harassment of mem-

bers of an organization or harassment directed against the organization itself. *Id.*

While the Supreme Court has approved disclosure requirements for contributors to political candidates, it has not expressly addressed the propriety of disclosure requirements for contributors to ballot initiatives and referenda. However, as discussed below, we conclude that dicta in several Supreme Court opinions and decisions of other courts support the conclusion that the *Buckley* standard should also apply to ballot initiatives and referenda.

The Independence Institute contends that the *McIntyre* Court made clear that disclosure laws applicable in the context of political candidate elections do not apply in other contexts, such as the election referenda here. We agree with Coffman that the Independence Institute has given too expansive a reading to *McIntyre*. There, the Supreme Court struck down part of an Ohio law that required speakers to reveal their identity on handbills distributed to the public and intended to influence the electoral process. Although the *McIntyre* Court held that such provision of the Ohio law was an impermissible direct regulation of the content of speech, it did not hold impermissible any statute requiring disclosure of contributors to ballot initiatives and referenda.

On the contrary, it acknowledged such disclosure requirements favorably its dicta in *First National Bank v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). There, the Supreme Court reversed a judgment of the Supreme Judicial Court of Massachusetts sustaining a state law that prohibited corporate expenditures designed to influence the vote on referendum proposals. 435 U.S. at 767, 98 S.Ct. 1407. In *McIntyre*, the Court observed that in *Bellotti*, it had noted the prophylactic effect of requiring identification of the source of corporate advertising. More specifically, the *McIntyre* Court quoted as follows from *Bellotti*: "Corporate advertising, unlike some methods of participation in political campaigns, is likely to be highly visible. Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which

they are being subjected." *McIntyre*, 514 U.S. at 354 n. 18, 115 S.Ct. 1511.

Similarly in *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 299–300, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), the Supreme Court held, while striking down a $250 limit on contributions to committees formed to support or oppose ballot measures, that "[t]he integrity of the political system will be adequately protected if contributors are identified in a public filing revealing the amounts contributed; if it is thought wise, legislation can outlaw anonymous contributions."

In *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (*ACLF*), the Supreme Court struck down a provision of a Colorado statute requiring, among other things, that petition circulators wear identification badges. Nevertheless, the *ACLF* Court noted that "[t]hrough the disclosure requirements that remain in place, voters are informed of the source and amount of money spent by proponents to get a measure on the ballot; in other words, voters will be told 'who has proposed [a measure],' and 'who has provided funds for its circulation.'" *ACLF*, 525 U.S. at 203, 119 S.Ct. 636.

Further, other courts have expressly held that the *Buckley* standard applies to ballot initiatives and referenda. In *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1101 (9th Cir.2003), the court held that express ballot measure advocacy may be regulated, provided that the state has a compelling interest and that the regulations imposed are narrowly tailored to advance the relevant interest. *See also Nat'l Right to Work Legal Defense & Educ. Foundation*, 581 F.Supp.2d at 1145, 2008 WL 4181336, at * 9; *Richey v. Tyson*, 120 F.Supp.2d 1298, 1310 (S.D.Ala.2000); *Volle v. Webster*, 69 F.Supp.2d 171, 173–74 (D.Me.1999).

Based on the reasoning in the above cases, we conclude that the disclosure requirements contained in § 1–45–108 do not violate the right to engage in anonymous speech and association and that disclosure of the identity of contributors to ballot measures may constitutionally be required under the standards

set forth in *Buckley*. Specifically, we note, as did the trial court, that the Independence Institute has not alleged that compelled disclosure of its contributors subjected them to threats, harassment, or reprisals from other government officials or private parties. Accordingly, we conclude that the trial court did not err in rejecting the Independence Institute's claim for relief on this issue.

### VII. Attorney Fees

The Independence Institute requests that, pursuant to C.A.R. 39.5, we award it attorney fees "as provided for by Colorado law." Because the Independence Institute has not prevailed in this litigation, we deny its request.

The judgment is affirmed.

Judge CARPARELLI concurs.

Judge CONNELLY specially concurs.

Judge CONNELLY specially concurring.

The majority upholds Colorado's financial disclosure requirements on "issue committees" supporting or opposing ballot issues. I concur in the results reached by the majority but write separately because my analysis differs in some respects.

As the majority explains, this is a constitutional challenge to Colorado's requirements on their face rather than as applied to a particular organization. A facial challenger has the daunting burden of showing "no set of circumstances exists under which the Act would be valid, *i.e.* that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, — U.S. —, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) (internal punctuation omitted); *compare McConnell v. FEC*, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (upholding facial constitutionality of Bipartisan Campaign Reform Act of 2002 provision outlawing certain corporate "electioneering communications"), *with Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410, 126 S.Ct. 1016, 163 L.Ed.2d 990 (2006) (holding *McConnell* did not foreclose as-applied challenges to same provision), *and FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. —, 127

S.Ct. 2652, 168 L.Ed.2d 329 (2007) (holding same provision unconstitutional as applied).

Colorado's definition of an issue committee is not vague "in all of its applications," *Washington State Grange*, — U.S. at —, 128 S.Ct. at 1190. The vagueness challenge turns on one word: "a" rather than "the" before "major purpose." Independence Institute contends *the* major purpose of an organization "is easily determinable in advance," but *a* major purpose is "inherently vague." Such a categorical contention is demonstrably incorrect. Take, for example, an "organization that has four equally important purposes, only one of which is electoral advocacy." *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274, 303 (4th Cir.2008) (*NCRL*). It will be easier, not harder, to determine "a" rather than "the" major purpose of that organization.

I cannot subscribe to the discussion in the majority opinion that in my view goes further than necessary or appropriate to reject this facial challenge. The majority opinion contains an extended discussion of cases that have "narrowly" construed provisions to avoid vagueness problems, and it outlines factors pertinent to a "fact-specific inquiry" into whether an organization is or is not an issue committee. But in my view the Colorado definition easily withstands a facial challenge without any narrowing construction beyond what the Secretary of State already provided. Discussion of factors relevant to determining whether an organization is an issue committee should be reserved for a case in which the legal definition must be applied to a particular organization under a given set of facts. In such a case, a multipurpose organization would remain free to raise an as-applied constitutional challenge.

Next, I agree with the majority's rejection of the overbreadth challenge but again remain concerned with any suggestions the challenge fails because of some judicial interpretation of the definition. Administrative regulations, not judicial construction, have obviated the only real overbreadth concern by requiring multipurpose issue committees to report only ballot-specific contributions and expenditures. Secretary of State Cam-

paign and Political Finance Rules 4.15, 8 Code Colo. Regs. 1505–6.

The Supreme Court has not—in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); in *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986); or in any other decision—accorded talismanic constitutional significance to whether "the" or "a" modifies major purpose. To the contrary, in a related context, it has upheld regulation of lobbyists where *"one of the main purposes* of such 'person,' or *one of the main purposes* of such contributions" was to influence legislation. *United States v. Harriss,* 347 U.S. 612, 623, 74 S.Ct. 808, 98 L.Ed. 989 (1954) (emphases added).

Next, I concur with the majority's holding that the reporting requirements do not violate the First Amendment right to speak anonymously on ballot issues. I write separately to opine that Independence Institute's contentions on this point are more substantial than its vagueness and overbreadth challenges.

Anonymous speech has a long and vital tradition predating the Constitution (as in the *Federalist Papers* ), and at least in some circumstances it is constitutionally protected. *See McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 341–57, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Moreover, one of the most compelling interests justifying disclosure of political candidate contributions, that of "deterring actual corruption and avoiding any appearance thereof," *McConnell,* 540 U.S. at 196, 124 S.Ct. 619, does not apply to ballot issues. *See California Pro–Life Council, Inc. v. Randolph,* 507 F.3d 1172, 1179 n. 9 (9th Cir.2007). The only applicable state interest—educating the electorate about financial interests behind ballot issues—is much less weighty than the interest in avoiding actual or apparent corruption of politicians. *See Common Sense Alliance v. Davidson,* 995 P.2d 748, 755 (Colo.2000) ("identity of supporters and opponents of a ballot initiative would be potentially helpful to the electorate, but the information is not nearly as critical as the identity of candidate supporters").

Nonetheless, as set forth in the majority opinion, Supreme Court dicta and lower court holdings have approved ballot issue disclosure requirements. Under these cases, a state's interest in disclosing financial interests behind ballot issues is sufficiently compelling (albeit less so than in the political candidate context) to overcome the right to speak anonymously. I therefore concur in the majority opinion on this point and in the rest of its opinion rejecting Independence Institute's case-specific appellate arguments.