507 P.3d 1053
2022 COA 6 M
NO LAPORTE GRAVEL CORP., Robert Havis, and Peter Waack, Plaintiffs-Appellants and Cross-Appellees,
v.
BOARD OF COUNTY COMMISSIONERS OF LARIMER COUNTY, Colorado; and Loveland Ready-Mix Concrete, Inc., Defendants-Appellants and Cross-Appellees.
Court of Appeals No. 20CA1207
Colorado Court of Appeals, Division VI.
Announced January 6, 2022
As Modified January 20, 2022
John M. Barth, Hygiene, Colorado, for Plaintiffs-Appellants and Cross-Appellees
William G. Ressue, County Attorney, Jeannine S. Haag, Assistant County Attorney, Fort Collins, Colorado, for Defendant-Appellee and Cross-Appellant Board of County Commissioners of Larimer County, Colorado
Hamre, Rodriguez, Ostrander & Dingess, P.C., Donald M. Ostrander, Joel M. Spector, Denver, Colorado, for Defendant-Appellee and Cross-Appellant Loveland Ready-Mix Concrete, Inc.
Foster Graham Milstein & Calisher, LLP, Chip G. Schoneberger, Denver, Colorado, for Amicus Curiae Colorado Stone, Sand & Gravel Association
David W. Broadwell, Laurel Witt, Denver, Colorado, for Amicus Curiae Colorado Municipal League
Opinion by JUDGE FOX
507 P.3d 1057 ¶ 1 We are asked to decide, as a matter of first impression in Colorado, whether campaign contributions can disqualify elected officials from serving as decision-makers in quasi-judicial proceedings under the Due Process Clause.
¶ 2 In Caperton v. A.T. Massey Coal Co. , 556 U.S. 868, 884, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), the United States Supreme Court held that, "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent," the Due Process Clause requires the judge's recusal. In so holding, the Supreme Court noted that the Due Process Clause provides only the outer limits for judicial disqualifications and that most disputes over disqualifications should be resolved by application of statutes, ordinances, or codes of conduct. Id. at 889-90, 129 S.Ct. 2252. The Caperton Court emphasized that recusal was required in that case because the facts were "rare," "exceptional," and "extreme." Id. at 884, 887, 890, 129 S.Ct. 2252.
¶ 3 In this case, several of Loveland Ready-Mix Concrete, Inc.’s (Ready-Mix) stockholders contributed to the campaign committee to reelect incumbent Larimer County Commissioner Tom Donnelly in the 2016 election. Their combined $4,100 contribution made up only 7.65% of the total amount his campaign raised and only 5.44% of the total spent in the election. Commissioner Donnelly's campaign accepted contributions between March and October 2016, before Ready-Mix's application to operate a gravel-pit mine and a concrete batch plant came before the Larimer County Board of Commissioners (Board). Commissioner Donnelly ultimately won reelection and, ignoring suggestions that he recuse, later voted, as part of a 2-1 majority, to approve Ready-Mix's application in November of 2018. We do not view the facts of this case as so rare, exceptional, or extreme as to rise to the level of a constitutional violation.
¶ 4 We therefore affirm the judgment of the district court granting summary judgment in favor of the Board and Ready-Mix and against No Laporte Gravel Corporation,[1] Robert Havis, and Peter Waack (collectively, NLGC) on their claim that Larimer County's conflict-of-interest rule, Larimer County Code § 2-67(10) (2018),[2] violated due process as applied to Commissioner Donnelly's participation in the Board's review of Ready-Mix's application.
¶ 5 The Board and Ready-Mix cross-appeal the court's order reversing the Board's decision approving Ready-Mix's application pursuant to NLGC's C.R.C.P. 106(a)(4) claim for judicial review. Though we agree with the district court that the Board misapplied a provision of the Larimer County Land Use Code (Land Use Code), we conclude that the Board's error does not warrant reversal. Thus, we reverse that portion of the district court's judgment and remand the case for further proceedings.
I. Background
A. Factual Background
¶ 6 In December 2016, Ready-Mix filed a special review application with the Larimer County Planning Department (Department) seeking a permit to construct and operate a sand and gravel mine near Laporte, Colorado. It also sought approval for a batch plant that would process the mined materials into concrete. The project would be located on four parcels of land zoned "Open" under the Land Use Code — zoning that permits mining, but not a concrete batch plant, as a "principal use" of property. Larimer County Land Use Code § 4.1.5 (2018). To engage in the proposed activities, Ready-Mix needed Board approval for "use by special review." See Land Use Code § 4.5.3.
507 P.3d 1058 ¶ 7 Ready-Mix's application included a document entitled "sketch plan project description," which outlined its initial vision of the operation as follows:
• during the life of the mine, sand and gravel would be delivered by conveyor or truck from the mining pit to a crusher, where the material would be washed and "sorted into sand stockpile and multiple gravel stockpiles";
• next, "aggregate from the gravel stockpiles w[ould] be hauled to a hopper to be conveyed to the batch plant";
• at the concrete batch plant itself, "aggregates [would be] mixed with cement and additives" imported from off-site; and
• the product from the concrete batch plant would be "combined with water at the concrete mixer truck load out facility adjacent to the batch plant" and the trucks would deliver the concrete product to customers.
¶ 8 On June 19, 2018, the Laporte Area Planning Advisory Committee (Committee) held a hearing to consider a recommendation for the Board. It voted 4-2 to recommend denying Ready-Mix's application because the proposed project was "not consistent with [the] overall Laporte Area Plan." The Committee's decision was grounded, in part, on the following: that the project "doesn't belong in the middle of Laporte"; environmental, traffic, water, air, and noise concerns; and potential negative effects on local businesses.
¶ 9 The Larimer County Planning Commission (Commission) considered the application next. After hearings on August 15, 2018, and August 22, 2018, the Commission unanimously voted 6-0 to recommend that the Board approve the project subject to forty-one conditions addressing various concerns of Laporte community members.
¶ 10 On September 18, 2018, a local resident informed the Larimer County Community Planning Division and Commissioner Donnelly, who was reelected in 2016, that the campaign contributions Commissioner Donnelly received from individuals affiliated with Ready-Mix required his recusal.
¶ 11 Two provisions of the Larimer County Code are relevant here.[3] Larimer County Code section 2-67(10) (2018) — the conflict-of-interest rule — states,
A member of the board of county commissioners who, in their sole opinion, believe[s] they have a conflict of interest or for any other reason believes that they cannot make a fair and impartial decision in a legislative or quasi-judicial decision, will recuse themselves from the discussion and decision. Any recusal will be made prior to any board discussion of the issue and the board member will leave the room for the remainder of the discussion of the issue.
¶ 12 Section 2-71, in turn, is titled "Board members’ code of conduct." As pertinent here, it requires members of the Board to "represent unconflicted loyalty to the interests of the citizens of the entire county" and states that "[t]his accountability supersedes any conflicting loyalty such as that to any advocacy or interest groups, or membership on other boards or staffs" and "the personal interest of any board member acting as an individual consumer of the county government's services." Larimer County Code § 2-71(1).
¶ 13 Ready-Mix's application was presented to the Board's three commissioners: Donnelly, Sean Dougherty, and Steve Johnson. The Board held public hearings on the application on September 24, 2018, and November 18, 2018. Representatives of NLGC — including people who own and reside in homes near the proposed gravel mine and batch plant — and Ready-Mix appeared before the Board and extensively debated whether the project would comply with the Land Use Code. The parties also sent competing letters to the Board addressing the project's compliance. Of particular concern was whether the concrete batch plant could be considered an allowable "accessory use" to the mining operation under the Land Use Code. See Land Use Code §§ 4.3.7(E), 4.3.10.
507 P.3d 1059 ¶ 14 At the conclusion of the second hearing, the Board approved Ready-Mix's application, with Commissioners Donnelly and Dougherty voting in favor and Commissioner Johnson voting against. Consistent with the vote, on January 15, 2019, the Board issued its written "Findings and Resolution" (Findings) formally approving the project for a term of twelve years subject to forty-one enumerated conditions.[4] As required by the Land Use Code, the Board found that each of the six special review criteria in section 4.5.3 — the criteria by which the Board reviews and evaluates a requested special review use — had been met or were inapplicable. In assessing one such criteria, it generally concluded that Ready-Mix "has demonstrated that this project can and will comply with all applicable requirements of the [Land Use Code]."
B. Procedural History
¶ 15 NLGC later timely filed a complaint against the Board and Ready-Mix in district court seeking judicial review of the Board's Findings. An amended complaint followed, raising two claims.
¶ 16 NLGC's first claim sought declaratory relief under C.R.C.P. 57. It challenged, in part, the constitutionality of Larimer County Code section 2-67(10), which entrusts members of the Board with the sole discretion to determine whether a possible conflict of interest warrants their recusal. NLGC argued that the provision, as applied, violated its due process rights. They cited in their complaint Commissioner Donnelly's failure to recuse himself from the administrative proceedings despite recently receiving campaign contributions from Ready-Mix. NLGC also requested that the district court declare the provision facially unconstitutional.
¶ 17 In its second claim, NLGC sought review of the Board's Findings under C.R.C.P. 106(a)(4). It argued that the Board abused its discretion because, among other things, it misapplied several of the special review criteria in Land Use Code section 4.5.3 and competent record evidence did not support its findings on those criteria. As relevant here, NLGC's argument rested, in part, on a contention that the concrete batch plant was not an allowable "accessory use" to the mining operation under the Land Use Code.
¶ 18 The Board and Ready-Mix filed a joint motion to dismiss NLGC's claims under C.R.C.P. 12(b)(1) and C.R.C.P. 12(b)(5). The court granted the motion in part and denied it in part on April 10, 2019. As to NLGC's first claim, it dismissed with prejudice NLGC's facial constitutional challenge to Larimer County Code section 2-67(10), but it found the as-applied challenge plausible enough to withstand the motion. The court also denied the motion as to NLGC's second claim.
¶ 19 The parties then filed cross-motions for summary judgment on NLGC's as-applied due process claim. Applying Caperton , 556 U.S. at 884, 129 S.Ct. 2252, the court concluded that Commissioner Donnelly's failure to recuse himself did not violate NLGC's due process rights. Thus, it denied NLGC's motion, granted the defendants’ cross-motions, and entered judgment in favor of the defendants on NLGC's C.R.C.P. 57 claim on April 15, 2020.
¶ 20 Having fully adjudicated NLGC's first claim, the court turned to NLGC's C.R.C.P. 106(a)(4) claim and set the case for oral argument. It also ordered the parties to file supplemental briefs addressing whether "the proposed concrete batch plant is not an ‘accessory use’ to mining and is therefore prohibited under the [Land Use Code]." The parties did so.
¶ 21 On June 8, 2020, after oral argument, the court issued an order in favor of NLGC. It determined that the Board erroneously found that section 4.3 of the Land Use Code — which includes several relevant provisions concerning "accessory uses" — was inapplicable. And that erroneous conclusion, it explained, led the Board to misapply two of the six special review criteria in Land Use 507 P.3d 1060 Code section 4.5.3 and thereby abuse its discretion. Accordingly, the court reversed the Board's decision and remanded the case to the Board for further administrative proceedings.
¶ 22 The parties now appeal two of the court's orders. NLGC appeals the court's April 15, 2020, order granting summary judgment in favor of the defendants on its as-applied due process claim. The defendants each cross-appeal, contending that the district court erred by entering judgment in favor of NLGC on its C.R.C.P. 106(a)(4) claim. We address each appeal in turn.
II. Standard of Review ¶ 23 "Review of a governmental body's decision pursuant to Rule 106(a)(4) requires an appellate court to review the decision of the governmental body itself rather than the district court's determination regarding the governmental body's decision." Bd. of Cnty. Comm'rs v. O'Dell , 920 P.2d 48, 50 (Colo. 1996). Our review is limited to deciding whether the governmental body's decision was an abuse of discretion, based on the evidence in the record before it, or was made in excess of its jurisdiction. C.R.C.P. 106(a)(4)(I) ; Whitelaw v. Denver City Council , 2017 COA 47, ¶ 7, 405 P.3d 433. ¶ 24 A governmental body abuses its discretion if it misinterprets or misapplies the law or if no competent record evidence supports its decision. Alpenhof, LLC v. City of Ouray , 2013 COA 9, ¶ 9, 297 P.3d 1052 ; Berger v. City of Boulder , 195 P.3d 1138, 1139 (Colo. App. 2008). The record lacks competent evidence if "the governmental body's decision is ‘so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority.’ " O'Dell , 920 P.2d at 50 (quoting Ross v. Fire & Police Pension Ass'n , 713 P.2d 1304, 1309 (Colo. 1986) ). ¶ 25 "An action by an administrative [body] is not arbitrary or an abuse of discretion when the reasonableness of the [body's] action is open to a fair difference of opinion, or when there is room for more than one opinion." Khelik v. City & Cnty. of Denver , 2016 COA 55, ¶ 13, 411 P.3d 1020. Because we are not the fact finder, we "cannot weigh the evidence or substitute our own judgment for that of the [administrative body]." Kruse v. Town of Castle Rock , 192 P.3d 591, 601 (Colo. App. 2008). ¶ 26 To the extent this appeal requires us to review and interpret the Land Use Code, we do so de novo and apply ordinary rules of statutory interpretation. See City of Commerce City v. Enclave W., Inc. , 185 P.3d 174, 178 (Colo. 2008) (We review de novo an agency's construction of "a code, ordinance, or statutory provisions that governs its actions."); Shupe v. Boulder Cnty. , 230 P.3d 1269, 1272 (Colo. App. 2010) ("Land use codes and ordinances ‘are subject to the general canons of statutory interpretation.’ " (quoting City of Colo. Springs v. Securcare Self Storage, Inc. , 10 P.3d 1244, 1248-49 (Colo. 2000) )). "When construing a land use code, courts look first to the plain language, being mindful of the principle that courts presume that the governing body enacting the code meant what it clearly said." Shupe , 230 P.3d at 1272. "If the code's language is ambiguous, we give deference to the board's interpretation of the code it is charged with enforcing ... if it has a reasonable basis in law and is warranted by the record." Id. "However, if the board's interpretation is inconsistent with the governing relevant articles, then that interpretation is not entitled to deference." Id.
III. NLGC's As-Applied Due Process Claim
¶ 27 We first address NLGC's as-applied due process claim. NLGC maintains that Commissioner Donnelly's failure to recuse himself violated its due process rights, and thus the district court erred by granting summary judgment in favor of the defendants. Applying Caperton for the first time in the context of a Colorado elected official serving in a quasi-judicial capacity, we disagree.
A. Construal as a C.R.C.P. 106(a)(4) Claim ¶ 28 The Board first contends that the district court did not have jurisdiction to consider NLGC's as-applied due process 507 P.3d 1061 claim because it was raised under C.R.C.P. 57 and not C.R.C.P. 106(a)(4). ¶ 29 "[A]s-applied challenges," as opposed to facial challenges, "concern the governmental body's quasi-judicial action." Kruse , 192 P.3d at 600. And a C.R.C.P. 106(a)(4) action is generally the sole remedy for review of a quasi-judicial action. Sundheim v. Bd. of Cnty. Comm'rs , 904 P.2d 1337, 1349 (Colo. App. 1995). But see Yakutat Land Corp. v. Langer , 2020 CO 30, ¶ 17, 462 P.3d 65 ; Native Am. Rts. Fund, Inc. v. City of Boulder , 97 P.3d 283, 287 (Colo. App. 2004). So the Board should have raised this claim under C.R.C.P. 106(a)(4). ¶ 30 However, any defect in NLGC's complaint was merely procedural in nature; it was not a jurisdictional bar to review as the Board suggests. Indeed, "a plaintiff need not label his action as one under C.R.C.P. 106(a)(4) to secure judicial review." High Plains Libr. Dist. v. Kirkmeyer , 2015 COA 91, ¶ 16, 370 P.3d 254. "The question which should concern us is not whether the plaintiff has asked for the proper remedy, but whether he is entitled to any remedy. If the plaintiff is entitled to relief under the allegations of the complaint, the court may grant it regardless of the specific remedy requested." Tisdel v. Bd. of Cnty. Comm'rs , 621 P.2d 1357, 1360 (Colo. 1980). Thus, even where plaintiffs do not "refer to C.R.C.P. 106(a)(4) as the basis for relief in their complaint, we are not bound by the label attached to their pleadings." High Plains Libr. Dist. , ¶ 17.
¶ 31 To preclude review of NLGC's claim, in our view, would improperly elevate form over substance. The alleged due process violations in the claim can be read as a basis to establish that the Board abused its discretion under C.R.C.P. 106(a)(4). See C.R.C.P. 106(a)(4) (Review under Rule 106(a)(4) is limited to whether a "lower judicial body exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion."); Fisher v. Colo. Dep't of Corr. , 56 P.3d 1210, 1213 (Colo. App. 2002) (a quasi-judicial body abuses its discretion when it fails to provide due process). And the claim, if properly styled as a C.R.C.P. 106(a)(4) action, would have been timely filed under the rule. See C.R.C.P. 106(b). Accordingly, we will construe NLGC's as-applied due process challenge as a C.R.C.P. 106(a)(4) claim and review whether the Board abused its discretion and violated NLGC's due process rights. See High Plains Libr. Dist. , ¶ 17 (similarly construing a request for declaratory judgment as a C.R.C.P. 106(a)(4) claim).
B. Additional Background
¶ 32 Commissioner Donnelly was elected to serve as a Larimer County Commissioner for three consecutive four-year terms from 2008 to 2020. When Ready-Mix's special use application was approved in 2018, Donnelly served as one of the Board's commissioners.
¶ 33 Ready-Mix is a closely held corporation that produces concrete and is operated by the Fancher family. George Fancher and Harold Kester purchased Ready-Mix in 1955.
¶ 34 During his 2012 and 2016 campaigns, Donnelly received lawful campaign contributions from persons who are either members of the Fancher or Kester families, Ready-Mix shareholders, or both.[5] Below is a breakdown of the contributions by election cycle and the proportion they collectively represent of Donnelly's total contributions:
507 P.3d 1062
Donor
2012 Campaign
2016 Campaign
Steve Fancher (George Fancher's son, Ready-Mix stockholder and former employee, and part-time consultant)
0
$1,500
Mimi Kontour (George Fancher's daughter and a stockholder)
$100
$200
Rebecca Kester (Harold Kester's daughter and a stockholder)
$100
$1,000
Brad Fancher (Ready-Mix Vice President and General Manager)
0
$1,000
Stephanie Fancher (Ready Mix Permitting and Land Use Manager and stockholder)
$50
$200
Sydney Fancher
$50
0
Scott Muller (Ready-Mix stockholder)
0
$200
Totals (raw/proportion of total donated to Donnelly campaign) $350 / 1% $4,100 / 7.65%
¶ 35 About a month after Donnelly won the 2016 election, Ready-Mix submitted the special review application that is the subject of this appeal. Before the Board convened its first hearing on the application, a local resident alerted a Larimer County official to Donnelly's receipt of campaign contributions from individuals associated with Ready-Mix and the asserted conflict of interest those contributions created. Donnelly was notified of these concerns but nonetheless participated in the application review process.
¶ 36 Donnelly's actions during the hearings on the application suggested that he supported the application. For example, Donnelly explained how his personal experience living in nearby Loveland informed his understanding of Ready-Mix's application:
[I]t is true that none of us live [in Laporte] and, none of us are going to ... have this pit near our homes for the next ... decade or so. As I mentioned, though ... we have a lot of pits in Loveland. ... [A]nd we co-exist with them ....
(Emphasis added.)
¶ 37 Donnelly later presented a motion to approve Ready-Mix's application. But when another Commissioner introduced an amendment to increase the physical setback of the pit from residential properties from 100 to 500 feet, Donnelly announced that he would oppose the application if amended as such. Finally, Donnelly voted against a second amendment to his motion that would have required Ready-Mix to access its facilities via State Highway 287 rather than County Road 54G, the latter of which winds through residential neighborhoods.
¶ 38 As noted, section 2-71(1) of the Larimer County Code requires members of the Board to maintain "unconflicted loyalty to the interests of the citizens of the entire county." Flowing from this principle, Larimer County Code section 2-67(10) outlines recusal standards, requiring any commissioner who, in his "sole opinion, believe[s] [he has] a conflict of interest or ... cannot make a fair and impartial decision in a legislative or quasi-judicial decision," to recuse.
¶ 39 NLGC claims on appeal that Donnelly's receipt of campaign contributions from individuals associated with Ready-Mix and his behavior during the hearings constitutes evidence that his failure to recuse himself, contrary to Larimer County Code section 2-67(10), deprived NLGC of the constitutionally protected due process right to a neutral decision-maker.
C. Discussion ¶ 40 Because we presume statutes are constitutional, to succeed on an as-applied challenge, the challenger must establish the unconstitutionality of the statute, as applied to him or her, beyond a reasonable 507 P.3d 1063 doubt.[6] Indep. Inst. v. Coffman , 209 P.3d 1130, 1136 (Colo. App. 2008) ; see also Dev. Pathways v. Ritter , 178 P.3d 524, 534 (Colo. 2008) (requiring the challenging party to establish that the law is unconstitutional "under the circumstances in which the [claimant] has acted or proposes to act") (citation omitted). ¶ 41 The due process requirement of neutrality in adjudicative proceedings entitles a person to an impartial decision-maker. City of Manassa v. Ruff , 235 P.3d 1051, 1056 (Colo. 2010) (citing Marshall v. Jerrico, Inc. , 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) ). An impartial adjudication requires "the absence of a personal, financial, or official stake in the decision evidencing a conflict of interest on the part of a decision-maker." Scott v. City of Englewood , 672 P.2d 225, 228 (Colo. App. 1983). This concept encompasses both the absence of actual bias and the risk of actual bias. See Caperton , 556 U.S. at 883-84, 129 S.Ct. 2252.
¶ 42 As to the latter, the United States Supreme Court elaborated on the risk of actual bias in Caperton , 556 U.S. at 883-84, 129 S.Ct. 2252. There, a candidate for the West Virginia Supreme Court of Appeals, Brent Benjamin, received $3 million in campaign contributions from Don Blankenship, a coal company chief executive officer whose company had recently sustained a $50 million dollar adverse jury verdict. Id. at 872-73, 129 S.Ct. 2252. For context, Blankenship's contributions exceeded the total amount spent by all of Benjamin's other supporters and was $1 million more than the amount raised by the other two candidates combined. Id. at 873, 129 S.Ct. 2252. Benjamin won the election, and, when Blankenship appealed the jury verdict, the opposing party submitted multiple requests for now-Justice Benjamin to recuse himself given his financial ties to Blankenship. Id. at 873-74, 129 S.Ct. 2252. Benjamin refused, concluding that there was no objective evidence of actual bias. Id. at 874-76, 129 S.Ct. 2252. He later voted, as part of the 3-2 majority, to reverse the jury verdict against the coal company. Id.
¶ 43 On appeal, the Court announced that a due process violation can arise, in lieu of concrete proof of actual bias, from the risk of actual bias. Id. at 884-85, 129 S.Ct. 2252. Because of the extreme size, proximate timing, and apparent effect of Blankenship's contribution, the Court concluded that there was a serious risk that Justice Benjamin was biased in violation of the Due Process Clause. Id. at 885-87, 129 S.Ct. 2252. To evaluate the risk of actual bias, the Court instructed us to consider objective factors such as the amount of the contribution, the temporal relationship between the contribution and the proceeding, and the apparent effect it had on the adjudication's outcome. Id. at 884-87, 129 S.Ct. 2252. ¶ 44 These due process mandates are not limited to judicial officers. Indeed, when decision-making by nonjudicial officers bears sufficient similarities to the adjudicatory function performed by courts, we consider it "quasi-judicial" and thereby subject to the basic requirements of due process. Ruff , 235 P.3d at 1056 (citing Cherry Hills Resort Dev. Co. v. City of Cherry Hills Vill. , 757 P.2d 622, 625-26 (Colo. 1988) ). While such actors must ensure the fundamental fairness of the proceeding, they are not held to the more rigorous disqualification standards applicable to judicial officers through ethical codes or local rules of procedure. Id. at 1057. Rather, the inquiry is simply whether actual bias or a risk of actual bias exists so as to compromise the neutrality of the quasi-judicial actor. Id. at 1056-57.
¶ 45 In this matter, the district court correctly noted that land-use decisions like Donnelly's are considered "quasi-judicial." See Margolis v. Dist. Ct. , 638 P.2d 297, 305 (Colo. 1981). It also recognized that those serving in quasi-judicial capacities are presumed to act with "integrity, honesty, and impartiality," 507 P.3d 1064 and that the challenger retained the burden to prove otherwise. Scott , 672 P.2d at 227. It then performed the due process analysis outlined in Caperton , ultimately denying NLGC's claims.
¶ 46 Before engaging in that analysis, however, the court dismissed (in a footnote) defendants’ threshold contention that campaign contributions, as a matter of law, do not constitute a "direct, personal, substantial, pecuniary interest" for conflict-of-interest purposes. Tumey v. Ohio , 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (2000). In other words, defendants argued that campaign contributions cannot bias an elected official serving in a quasi-judicial capacity, and that a Caperton -style analysis was therefore inappropriate in the first place.
¶ 47 Although the bulk of their arguments on appeal focus on affirming the merits of the district court's application of Caperton , Ready-Mix insists — and is joined by Colorado Municipal League as amicus curiae in this respect — that campaign contributions, as a categorical matter, can never give rise to a risk of actual bias by the quasi-judicial decision-maker. In rejecting this argument, the district court noted that Colorado courts have not directly addressed this issue. We do so now.
1. Caperton ’s Applicability
¶ 48 At the outset, we recognize that Colorado law addresses the intersection between campaign contributions and conflicts of interest.
¶ 49 The Colorado Constitution lays this foundation. In outlining ethical standards for government officials, it notes that public officers "must hold the respect and confidence of the people" and that they therefore must "avoid conduct that is in violation of [that] public trust or that creates a justifiable impression among [the public] that such trust is being violated." Colo. Const. art. XXIX, § 1 (1)(a), (1)(c). Building on this idea, public officials cannot receive "any money, forbearance, or forgiveness of indebtedness from any person, without such person receiving lawful consideration of equal or greater value in return...." Colo. Const. art. XXIX, § 3 (1). Critically, however, the ban expressly does not apply to "campaign contribution[s]." Colo. Const. art. XXIX, § 3 (3)(a).
¶ 50 The Colorado statute detailing ethical standards for public officials, section 24-18-104, C.R.S. 2021, also toes this line. While it prohibits public officials from accepting anything "tantamount to a gift of substantial value" given with the intent to influence or which would reasonably tend to influence that public official, it likewise excludes "[c]ampaign contributions" as something of value. § 24-18-104(1)(b), (3)(a), C.R.S. 2021.
¶ 51 Based on these authorities, Ready-Mix posits that conflict-of-interest issues stemming from campaign contributions have been comprehensively addressed, and therefore applying Caperton to evaluate whether Donnelly was improperly influenced by campaign contributions is unnecessary.
¶ 52 Ready-Mix takes an extreme position. Under its theory, an individual appearing before a board of elected officials can never mount a due process challenge to the impartiality of the board's adjudicatory actions if that challenge is premised on the improper influence of campaign contributions. So, regardless of the relative size, timing, and apparent effect that the contribution has on the quasi-judicial actor, his impartiality — a cornerstone of due process — can never be questioned.
¶ 53 We decline to adopt such an extreme position. Indeed, doing so would defy the underlying logic of Caperton — namely, that in certain "extraordinary situation[s]," campaign contributions can create a constitutionally impermissible risk of actual bias on the part of an adjudicatory decision-maker. Caperton , 556 U.S. at 887, 129 S.Ct. 2252. Though it is true that the decision-maker Caperton was a judicial officer, he was an elected judicial officer. Id. at 873, 129 S.Ct. 2252. The principle is therefore equally applicable here, where a local elected official performs quasi-adjudicatory acts.
¶ 54 Permitting such inquiries is also consistent with our precedent. We have previously recognized that "the absence of a personal, financial , or official stake in the decision" is a necessary component of impartial adjudication. Scott , 672 P.2d at 228 507 P.3d 1065 (emphasis added). The notion that campaign contributions can never — regardless of their size, timing, or apparent effect — qualify as a "financial" stake in a quasi-judicial proceeding is questionable and inconsistent with case law. ¶ 55 Our primary concern is the Due Process Clause, and its promise that individuals appearing before quasi-judicial bodies are guaranteed an impartial decision-maker. See Ruff , 235 P.3d at 1056. That constitutional guarantee must be protected regardless of how the decision-maker arrived at a position.
¶ 56 Bearing that in mind, we understand that our conclusion may implicate other constitutional rights — most prominently, the First Amendment. The right to make campaign contributions is, of course, protected by the First Amendment. See Buckley v. Valeo , 424 U.S. 1, 14-22, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ; see also Caperton , 556 U.S. at 884, 129 S.Ct. 2252 (recognizing that "[n]ot every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal"). Seizing on that principle, Colorado Municipal League (as amicus curiae) argues that if we recognize that campaign contributions could theoretically compromise the impartiality of elected officials serving in quasi-judicial capacities, then we effectively tell potential contributors to "forego your First Amendment rights and eschew contributions that may make it impossible for the elected official to perform ... [her] job."
¶ 57 Such absolutist rhetoric ignores the fact that Caperton , by its terms, is limited to "extraordinary situation[s]." Caperton , 556 U.S. at 887, 129 S.Ct. 2252. Indeed, the Court squarely addressed the dissent's similar contention that the ruling would lead to "unnecessary interference with judicial elections" by emphasizing that the immediate facts were "extreme by any measure," and that the holding was "confined to rare instances." Id. at 887-90, 129 S.Ct. 2252. Implicit in this conclusion is a conciliation between First Amendment and due process rights, whereby campaign contributions are constitutionally permissible outside of extraordinary situations. The extraordinary situation arises when — because of their size, timing, and apparent effect — the contribution violates another's due process rights to an impartial adjudication. ¶ 58 This position fairly balances the vital First Amendment right to make campaign contributions and the equally important due process right to a neutral decision-maker. See Buckley , 424 U.S. at 14-22, 96 S.Ct. 612 ; Ruff , 235 P.3d at 1056. Accordingly, we conclude that campaign contributions to an elected official serving in a quasi-judicial capacity constitute "a direct, personal, substantial, pecuniary interest" sufficient to trigger a due process analysis under Caperton . Caperton , 556 U.S. at 876, 129 S.Ct. 2252 (quoting Tumey , 273 U.S. at 523, 47 S.Ct. 437 ).
2. Caperton Analysis ¶ 59 With that threshold question answered, we turn to NLGC's contention that the district court erred by concluding that Donnelly's failure to recuse after receiving certain campaign contributions did not violate its due process rights to a neutral decision-maker. NLGC argues the court misapplied Caperton in three ways: (1) its conclusion that no temporal relationship existed between the contributions and Ready-Mix's application; (2) its conclusion that the amount of contributions was insufficient to create a risk of bias; and (3) its conclusion that there was no actual bias. We disagree.
¶ 60 NLGC first faults the district court for relying on the fact that Ready-Mix's application was not pending when the donations were made. Under Caperton , campaign contributions to a decision-maker when the case is "pending or imminent" can give rise to a risk of actual bias. Id. at 884, 129 S.Ct. 2252. So, the district court's apparent requirement that the matter be pending when the contributions were made misapplies Caperton . Be that as it may, the error was harmless.
¶ 61 Although the application was submitted shortly after Donnelly's election, the Board did not take action on the matter for nearly two years . Putting aside that temporal disparity, there is also a key distinction between what NLGC and the Court consider "imminent." Unlike the contributions in 507 P.3d 1066 Caperton , which were made after a trial, the contributions here were made before any action was taken on the application. Conspicuously absent is an event (such as a jury verdict) supporting an inference that an identifiable action (like an appeal) was imminent. Even if we accept that a temporal relationship exists between the contributions and Ready-Mix's application — which could ensnare essentially all campaign contributions — it is just one factor and, standing alone, cannot support reversal.
¶ 62 Ancillary to this claim is NLGC's assertion that Donnelly's receipt of $4,100 created an unconstitutional risk of bias. These contributions constituted just 7.65% of the total Donnelly raised for his 2016 campaign, and 21.54% of the total Donnelly's only challenger, Karen Stockley, raised for her campaign. While fundraising for local elections can be modest compared to statewide contests, Caperton asks us to consider the donation in relation to the total contributions of the recipient and competitors. The $4,100 at issue here are, in raw and proportionate terms, a far cry from the contributions in Caperton , where Blankenship's $3 million exceeded the amount spent by all of Benjamin's other supporters and both of his competitors combined. We therefore agree with the district court that the amounts Donnelly received here do not create a risk of actual bias.
¶ 63 Finally, NLGC asserts that Donnelly's behavior during a Board hearing proves that he was actually biased. In support, it points to his comment that people can "co-exist" with gravel pits, and his objection to a 500 foot physical setback and truck routing via State Highway 287.
¶ 64 These arguments are unavailing. Viewed in context, Donnelly's "co-exist" comment was made as part of a larger statement about the ability of a community to co-exist with gravel pits — as his Loveland community, in his view, had done. The subjective weighing of such community compatibility is a requirement of Land Use Code section 4.5.3, and NLGC's arguments contending otherwise are misplaced. Relatedly, his thwarting of the 500 foot setback and alternative route is otherwise explainable, most notably because they were not practically feasible. All told, NLGC's claimed evidence of bias does not support an inference that these actions reflect actual bias — let alone prove actual bias beyond a reasonable doubt, as NLGC was required to do. Coffman , 209 P.3d at 1136.
IV. Judicial Review of the Board's Findings
¶ 65 The Board and Ready-Mix cross-appeal, arguing that the district court erred by entering judgment in favor of NLGC on the C.R.C.P. 106(a)(4) claim. Specifically, they contend that the stated premise underlying the court's decision was erroneous: the Board did not, as the court found, misapply Land Use Code section 4.5.3(C) or (F) in approving Ready-Mix's application. Accordingly, they ask that we reverse the court's judgment.
¶ 66 Like the district court, we conclude that the Board misapplied section 4.5.3(F), albeit for a different reason. However, we agree with the Board and Ready-Mix that the Board did not misapply section 4.5.3(C). And, as we explain below, the Board's application of section 4.5.3(C) rendered any infirmity in its application of section 4.5.3(F) harmless. Thus, we reverse the district court's judgment and remand for further proceedings.
A. Relevant Provisions of the Land Use Code
¶ 67 To approve a special review application, the Board must consider several "review criteria" enumerated in Land Use Code section 4.5.3 and find that each criterion has been met or is inapplicable. Section 4.5.3(C) and (F) provide two such criteria.
¶ 68 Under section 4.5.3(C), the Board must consider whether "[t]he applicant has demonstrated that this project can and will comply with all applicable requirements of [the Land Use Code]." Thus, section 4.5.3(C) functions as a catch-all provision that ensures a project will generally comply with the Land Use Code. The Board ultimately found that the proposed project met this criterion.
507 P.3d 1067 ¶ 69 Land Use Code section 4.5.3(F), on the other hand, is more specific. It requires the Board to consider whether "[t]he applicant has demonstrated that this project can meet applicable additional criteria listed in the section 4.3 use descriptions." Id. The parties identify two provisions within Land Use Code section 4.3 that may be relevant to Ready-Mix's project, particularly to the batch plant approval — sections 4.3.10 and 4.3.7(E). They dispute, however, whether the provisions contain "applicable additional criteria."
¶ 70 The Land Use Code contemplates that a use of property that otherwise may not be permitted in a specific zoning district can nonetheless be approved as part of a proposed project as an "accessory use." Section 4.3.10 provides as follows:
Accessory uses and structures are intended to allow property owners the full use of their property while maintaining the integrity and character of the neighborhood. To accomplish these goals, accessory uses and buildings must be erected and used only for purposes that are clearly secondary and incidental to the principal use of the property and must be located on the same lot with the principal use.
¶ 71 Section 4.3.7(E) is specific to mining. It states as follows:
Mining. The act of exploring for and recovering stone, soil, peat, sand, gravel, limestone, coal, granite or other mineral resources from the ground for sale or for use off the property where it was recovered. Mining does not include the removal of loose surface stone, excavation solely for farm practices, excavation for a basement or footing for a structure authorized by a valid building permit or grading authorized by a valid grading permit.
Section 4.3.7(E)(1) then clarifies that
[o]n-site processing of mined materials is considered accessory to the mining activity but must be included in the special review application and reviewed simultaneously with the mining special review application.
¶ 72 As to section 4.5.3(F) — regarding "applicable additional criteria" in section 4.3 — the Board ultimately concluded as follows: "This criterion is not applicable. There are no special criteria or standards listed for mining."
B. The Board Misapplied Land Use Code Section 4.5.3(F)
¶ 73 The district court understood the Board's written finding on section 4.5.3(F) as concluding that section 4.3 was inapplicable to Ready-Mix's project. Because the parties all acknowledged during the district court proceedings that section 4.3 in fact applied, the court determined that the Board misapplied section 4.5.3(F).
¶ 74 The defendants, however, argue that the court misconstrued the Board's finding. We agree. The Board did not suggest that it found section 4.3 to be inapplicable, but that section 4.3 did not contain any "additional applicable criteria," and thus section 4.5.3(F) did not apply. Hence, the Board stated only that "this criterion" — i.e., section 4.5.3(F) — was inapplicable, not section 4.3. Thus, we disagree with the district court's reasoning as to why the Board misapplied the provision. ¶ 75 Still, the question remains whether the Board correctly found that section 4.3 contained no "additional applicable criteria" that it needed to consider. The parties direct us to sections 4.3.10 and 4.3.7(E) of the Land Use Code in particular.
¶ 76 The defendants posit that these provisions are merely definitional in nature and, viewed as such, cannot be read to contain "additional applicable criteria." As they point out, in contrast to other provisions within section 4.3, neither details specifications that a mining use — or a batch plant — must satisfy. Cf., e.g. , Land Use Code § 4.3.7(H), (N)(1), (O) (outlining specific and technical standards for various uses and, in one instance, explicitly stating that the requirements are "in addition [to] the section 4.5 minor special review criteria").
¶ 77 Yet, as they did before the district court, the defendants specifically acknowledge that the proposed batch plant must fall within Land Use Code section 4.3.10 or section 4.3.7(E)’s definition of an "accessory use" to be permitted as part of the project. 507 P.3d 1068 Indeed, the Board itself states in its opening brief that "the Board understood that to be included in the project, the Batch Plant must be an allowable accessory use and the Board evaluated it as such"; it then explains why the batch plant is an "accessory use" under sections 4.3.10 and 4.3.7(E). So the defendants appear to concede that the definitions in sections 4.3.10 and 4.3.7(E) function as an applicable standard for whether the batch plant could be approved as part of the proposed mining project. And, in our view, the term "additional applicable criteria" is unambiguously broad enough to encompass a requirement that a project must meet for approval. ¶ 78 The defendants argue, however, that we ought to defer to the Board's contrary interpretation of the Land Use Code. But the Board is only entitled to deference where, unlike here, the language of a provision is ambiguous. See Shupe , 230 P.3d at 1272. Moreover, even then, the Board's interpretation must have a reasonable basis in the law to warrant deference. See id. And we discern no such basis here; the Board's interpretation that sections 4.3.10 and 4.3.7(E) did not include any criteria relevant to its approval of the project cannot be reconciled with its concession that the provisions establish an applicable requirement that the proposed batch plant had to satisfy.
¶ 79 In sum, then, the Board misapplied and misinterpreted section 4.5.3(F) by concluding that section 4.3 contained no "additional applicable criteria" that it needed to consider in approving the project. Thus, it abused its discretion. See Berger , 195 P.3d at 1139.
¶ 80 But this conclusion here does not end our inquiry. We still must consider whether the Board's abuse of discretion warrants reversal of its decision. As discussed below, that question is informed by whether the Board properly applied section 4.5.3(C).
C. The Board Did Not Misapply Land Use Code Section 4.5.3(C)
¶ 81 The district court's misunderstanding of the Board's section 4.5.3(F) finding led it to similarly conclude that the Board had misapplied section 4.5.3(C) — after all, if the Board wrongly concluded that section 4.3 was inapplicable, it could not have properly found that the "project can and will comply with all applicable requirements of [the Land Use Code]." Land Use Code § 4.5.3(C). But, again, we disagree that the Board found section 4.3 inapplicable, and thus reject the court's basis for concluding that the Board misapplied section 4.5.3(C).
¶ 82 In light of the court's erroneous conclusion, it never reached NLGC's contention that the Board misapplied section 4.5.3(C) because the project failed to comply with section 4.3's substantive requirements. On appeal, the defendants maintain that the Board not only considered section 4.3 but properly found that the project complied with the relevant provisions therein. Thus, they argue, contrary to the district court's conclusion, the Board did not misapply section 4.5.3(C). We agree.
1. The Board Implicitly Found That the Batch Plant Is an "Accessory Use"
¶ 83 The parties agree that the proposed batch plant must constitute an "accessory use" as defined in Land Use Code section 4.3.10 or section 4.3.7(E) to be approved as part of the project. In other words, whether the batch plant is an "accessory use" under those provisions is one of the "applicable requirements" of the Land Use Code that the Board had to consider in assessing the application's compliance with section 4.5.3(C). ¶ 84 Problematic, however, is that the Board did not make an express finding that the proposed batch plant is an allowable "accessory use." NLGC suggests that the absence of such an express finding is fatal to the defendants’ claim that the Board properly applied section 4.5.3(C) and precludes judicial review of its decision.
¶ 85 However, in Sundance Hills Homeowners Ass'n v. Board of County Commissioners , 188 Colo. 321, 328-29, 534 P.2d 1212, 1216 (1975), our supreme court rejected a similar argument. It concluded that the absence of specific findings supporting a board's decision does not warrant reversal if the record is nonetheless sufficient to enable 507 P.3d 1069 adequate judicial review. See id. In reaching its conclusion, the court quoted with approval the following from a Rhode Island case addressing a zoning board's decision:
[I]t does not follow that a decision of the zoning board will necessarily be reversed absent express findings of the ultimate facts upon which the decision must rest. It is well settled that, if upon an examination of the record this court can find from the evidence contained therein that the board necessarily acted on the basis of such findings, although not expressed, in the interests of practical justice we will not reverse the decision. Where a board of review acts affirmatively upon an application ... the granting of which is conditioned upon the finding of ultimate facts prescribed in the ordinance, we will hold, in the absence of an express finding thereon, that there is an implicit finding in the decision of these prerequisite facts when the state of the evidence is such as would warrant the making of such finding by the board. Id. (quoting Cugini v. Chiaradio , 96 R.I. 120, 189 A.2d 798, 801 (1963) ).
¶ 86 The principle from Sundance has since been repeatedly endorsed, if not expanded, by divisions of this court. See, e.g. , Hudspeth v. Bd. of Cnty. Comm'rs , 667 P.2d 775, 778 (Colo. App. 1983) ("The absence of express findings by a lay board does not affect the validity of the decision where the necessary findings are implicit in the action taken."); see also Fire House Car Wash, Inc. v. Bd. of Adjustment for Zoning Appeals , 30 P.3d 762, 768 (Colo. App. 2001) ("While more detailed findings of fact and conclusions of law are preferable on appeal, the absence of express findings by a lay board does not affect the validity of the decision when the necessary findings are implicit in the action taken."); Burns v. Bd. of Assessment Appeals , 820 P.2d 1175, 1177 (Colo. App. 1991) ("[A]n agency's findings of fact may be express or implied.... [T]he absence of findings by an administrative board is not fatal to a decision if there is evidence in the record which supports its decision. ... [Thus, the board's] express findings, taken together with reasonable implications based upon its assessment of the totality of the evidence presented ... [may be] adequate to apprise us of the basis of the decision.").
¶ 87 As an ultimate fact upon which the Board's decision rested, it would have been good administrative practice to make an express finding that the batch plant was an "accessory use." But the absence of such finding did not render the Board's decision on Land Use Code section 4.5.3(C) erroneous or unreviewable. See Sundance , 188 Colo. at 328-29, 534 P.2d at 1216. Indeed, so long as the record supports that the Board "necessarily acted on the basis" that the batch plant was an "accessory use," and "the state of the evidence is such as would warrant the making of [that] finding," we will infer that the Board properly made the finding. Id.
¶ 88 The record shows that the parties to the administrative proceedings extensively briefed the Board on whether the batch plant is an "accessory use." The issue was also argued at the hearing on the application, during which NLGC's attorney summarized Ready-Mix's application as "seeking as an accessory use by special review approval to construct and operate a concrete batch plant" and directly asked the Board to "make a specific ruling on [the issue]." And a county staff member who appeared before the Board echoed that Ready-Mix was specifically seeking special review approval of the batch plant. Thus, the record indicates that the Board was not only on notice of the issue, but that the issue was expressly presented to the Board for its consideration.
¶ 89 Moreover, the Board's Findings explicitly referred to the batch plant (in addition to mining) as a proposed use under consideration. The Board also alluded in its decision to the parties’ briefings on the "accessory use" issue, finding Ready-Mix's arguments "to be persuasive." And significantly, the concrete batch plant could only be approved as an "accessory use"; unlike mining, the Land Use Code does not allow for concrete batch plants as a principal use in a district zoned "Open." See Land Use Code § 4.1.5. Thus, the record strongly suggests that the Board specifically considered whether the batch plant was an allowable "accessory use."
507 P.3d 1070 ¶ 90 In light of the above, and because section 4.5.3(C) requires that the Board consider "all applicable requirements" of the Land Use Code, we will presume under these circumstances that the Board "necessarily acted on the basis" that the batch plant was an allowable "accessory use." Accordingly, so long as competent record evidence supports that finding, we will infer that the Board implicitly and properly made the finding. See Sundance , 188 Colo. at 328-29, 534 P.2d at 1216.
2. Competent Record Evidence Supports the Conclusion that the Batch Plant Was an "Accessory Use" ¶ 91 Because it is undisputed that the batch plant will use imported, nonmined materials to manufacture concrete, it is questionable that the batch plant could be considered an "accessory use" under section 4.3.7(E). See Land Use Code § 4.3.7(E)(1) (stating that the "[o]n-site processing of mined materials is considered accessory to the mining activity"). Thus, in reviewing for competent record evidence, we consider only Land Use Code section 4.3.10's definition of an "accessory use": a use that is "clearly secondary and incidental to the principal use of the property."[7] ¶ 92 Though Ready-Mix's original plan contemplated operating the batch plant in perpetuity, the approved version of the plan limits its period of operation to the life of the mine. Indeed, Ready-Mix repeatedly assured the Board that "the batch plant will not operate after mining operations have ceased." And the only stated purpose of the batch plant for that time period is to use the materials produced by the mining operation to manufacture concrete. That the batch plant was predicated on — and secondary to — the existence of the mining operation was thus evident from the framework of the project itself.
¶ 93 Moreover, in its briefing to the Board on the "accessory use" issue, Ready-Mix represented, among other things, that
• the mining operation would occupy ninety-six percent of the property, while the batch plant would occupy four percent;
• the planned investment in the mining operation was $9,860,000, as opposed to only $1,500,000 for the batch plant; and
• of the $788,900 reclamation bond that Ready-Mix intended to post with the Colorado Division of Reclamation Mining and Safety, ninety-seven percent of the bond can be attributed to mining, and only three percent to the batch plant.
¶ 94 Additionally, at the hearing on the application, the senior planner of the Department testified that, from his department's perspective, a concrete batch plant is a "normal ancillary or pertinent use" to a sand and gravel operation. He also acknowledged that "[i]t has historically been Larimer County's position that a batch plant, be it asphalt or concrete, is a normal and accessory [appurtenant] to a sand and gravel operation."
¶ 95 Therefore, competent record evidence supported that the batch plant was an allowable "accessory use" under Land Use Code section 4.3.10. See O'Dell , 920 P.2d at 50. Accordingly, despite the lack of an express finding to that effect, we will infer that the Board properly made such a finding, as it was implicit in its decision and supported by the record. See Sundance , 188 Colo. at 328-29, 534 P.2d at 1216 ; Hudspeth , 667 P.2d at 778 ; Burns , 820 P.2d at 1177. Thus, we discern 507 P.3d 1071 no error in the Board's application of Land Use Code section 4.5.3(C).[8] D. The Board's Abuse of Discretion as to Land Use Code Section 4.5.3(F) was Harmless ¶ 96 Having concluded that the Board did not misapply Land Use Code section 4.5.3(C), we return to whether the Board's misapplication of Land Use Code section 4.5.3(F) warrants reversal. We agree with the defendants that it does not. ¶ 97 "The harmless error rule applies to judicial review of administrative proceedings [in a C.R.C.P. 106(a)(4) action], and errors in such administrative proceedings will not require reversal unless [p]laintiffs can show they were prejudiced." Sheep Mountain All. v. Bd. of Cnty. Comm'rs , 271 P.3d 597, 606 (Colo. App. 2011) (quoting Bar MK Ranches v. Yuetter , 994 F.2d 735, 740 (10th Cir. 1993) ). Indeed, "[w]here the agency's mistake did not affect the outcome of the proceedings, ‘it would be senseless to vacate and remand for reconsideration.’ " Rags Over the Ark. River, Inc. v. Colo. Parks & Wildlife Bd. , 2015 COA 11M, ¶ 65, 360 P.3d 186 (quoting Jicarilla Apache Nation v. U.S. Dep't of Interior , 613 F.3d 1112, 1121 (D.C. Cir. 2010) ).
¶ 98 The Board misapplied section 4.5.3(F) by failing to consider whether the batch plant constituted an allowable "accessory use" under sections 4.3.10 or 4.3.7(E). Ultimately, though, the Board properly — albeit implicitly — made the requisite finding when ruling on section 4.5.3(C). Accordingly, any prejudice from the Board's failure to consider the issue in applying section 4.5.3(F) was necessarily remedied. Thus, the Board's misapplication of section 4.5.3(F) was harmless and does not require reversal of its decision.[9] Sheep Mountain All. , 271 P.3d at 606.
V. Conclusion
¶ 99 The judgment is affirmed in part and reversed in part. We affirm the court's order granting summary judgment in favor of the defendants on NLGC's C.R.C.P. 57 claim. However, we reverse the court's order finding in favor of NLGC on its C.R.C.P. 106(a)(4) claim and reversing the Board's decision. The case is remanded for the district court to consider the remaining contentions in NLGC's C.R.C.P. 106(a)(4) claim that have not yet been addressed.
JUDGE WELLING and JUDGE JOHNSON concur.
--------
Notes:
[1] NLGC is a Colorado nonprofit formed to protect Laporte from adverse impacts of gravel mining operations, concrete batch plant operations, and related industrial activities in the Laporte planning area.
[2] The Larimer County Code has since been amended, but the amendments do not affect the substance of the arguments raised. This opinion references the sections of the code in effect at the time of the Board's challenged decision.
[3] The Land Use Code represents a distinct part of the overall Larimer County Code that we will refer and cite to separately. Both were applicable to the administrative proceedings.
[4] The Board's Findings approved Ready-Mix's special use application, noting that "Commissioners Donnelly and Dougherty voted in favor of the Findings and Resolution," while "Commissioner Johnson voted against the Resolution," but it did not address the earlier request that Commissioner Donnelly not participate in the matter.
[5] There are no allegations that Donnelly or Donnelly's campaign violated applicable campaign contribution disclosure laws.
[6] NLGC argues that, in light of Sanger v. Dennis , 148 P.3d 404, 407 (Colo. App. 2006), the district court should only have required it to show "a reasonable probability" that the provision was unconstitutional as applied. We are unpersuaded. In Sanger , the "reasonable probability" standard was applied in response to a motion for a preliminary injunction, which itself requires the moving party to demonstrate a "reasonable probability" that it will subsequently prevail on the merits. Id. at 409 ; see City of Golden v. Simpson , 83 P.3d 87, 96 (Colo. 2004).
[7] In a departure from the Board and Ready-Mix, Colorado Stone, Sand & Gravel Association (CSSGA) argues in its amicus brief that Larimer County Land Use Code section 4.3.10 (2018) is wholly inapplicable. Instead, it contends, the Board was only required to consider Land Use Code section 4.3.7(E). CSSGA cites section 3.3(B) of the Land Use Code, which instructs that "[t]he particular controls the general" when interpreting the code. In light of that directive, CSSGA reasons, "[section] 4.3.7(E)(1)’s specific provision that ‘on-site processing of mined material is considered an accessory use to the mining activity’ trumps [section] 4.3.10's general description of the purpose and location of ‘accessory uses.’ " But the two provisions are not inconsistent. Section 4.3.10 broadly defines "accessory use," and section 4.3.7(E)(1) merely clarifies that, in the context of mining activities, "[o]n-site processing of mined materials" is per se an "accessory use." Because there is no issue as to which provision is controlling, section 3.3(B) is not implicated. Thus, we assume, as do the defendants, that section 4.3.10 applies.
[8] While Land Use Code section 4.5.3(C) references "all applicable requirements" of the Land Use Code, in arguing that the Board misapplied the provision, NLGC's complaint only alluded to the project's alleged failure to comply with Land Use Code section 4.3. And the parties’ arguments on appeal likewise address only section 4.3's requirements. Thus, in concluding that the Board did not misapply section 4.5.3(C), we considered only the relevant requirements of section 4.3; we express no opinion as to whether the project failed to comply with any other applicable requirement. Accordingly, our conclusion here does not preclude the district court from reviewing on remand NLGC's other asserted violations of the Land Use Code that have not yet been addressed.
[9] NLGC argues that we should not consider whether the Board's misapplication of Land Use Code section 4.5.3(F) was harmless because the defendants failed to raise the matter below. However, in its supplemental brief addressing the "accessory use" issue, Ready-Mix argued that the Board's decision should be upheld notwithstanding any error in its section 4.5.3(F) finding because (1) the Board found that the project complied with all requirements of the Land Use Code under section 4.5.3(C) and (2) the batch plant constitutes an allowable "accessory use" under sections 4.3.10 and 4.3.7(E). Thus, while Ready-Mix did not specifically recite the harmless error rule in its brief, the brief included the "sum and substance" of the harmlessness argument it advances on appeal. Accordingly, Ready-Mix sufficiently preserved the argument for our review. See Berra v. Springer & Steinberg, P.C. , 251 P.3d 567, 570 (Colo. App. 2010) (Where a party "presented to the trial court the sum and substance of the argument it now makes on appeal, we consider that argument properly preserved for appellate review.").
--------